(No. 75834.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOSE COLON, Appellee.

*Opinion filed September 22, 1994.*

24

McMORROW, J., dissenting.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and William Toffenetti, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Jose Colon, was found guilty of first degree murder. He was subsequently sentenced to 50 years in the Illinois Department of Corrections. The appellate court reversed the judgment of the circuit court (249 Ill. App. 3d 141), with one justice dissenting, and we granted the State leave to appeal pursuant to Supreme Court Rule 315 (134 Ill. 2d R. 315). The State relies upon four points for reversal of the appellate court's decision: (1) that evidence concerning defendant's gang membership and certain facts relating to gang activities was properly admitted to prove that the crime was gang motivated, (2) that evidence introduced concerning a second shooting was properly admitted to prove that the crime was gang motivated, (3) that an instruction to the jury that defendant had made a statement "relating to the offense" was properly admitted, and (4) that evidence indicating that two individuals viewed a lineup was not hearsay. For the reasons which follow, we reverse.

The evidence, when viewed in the light most favorable to the State, showed that on September 3, 1990, at approximately 11:30 p.m., Rafael Matamoros and some friends were gathered around a car. These friends included Daniel Rivera, Deandre Jackson, Nathan Iverson, Marvin King and Miguel (last name unknown). The car was owned by Daniel Rivera. The car was parked on Hirsch Street in front of Lowell Grammar School. Hirsch Street is a one-way street eastbound. Lowell School is located between Homan, a north-south street that is to the west of the school, and Spaulding which is to the east. At the time of the incident the victim, Rafael Matamoros, was seated on the hood of the car, Rivera was seated on the driver's side fender, Jackson was

seated on the car's front bumper and Iverson was by the front end on the driver's side. The record does not indicate where the other individuals were in relation to the car.

Rivera testified that he saw a car coming slowly down Hirsch Street. He described the car as gray with a light-blue top, four doors and tinted windows. Rivera indicated that the car stopped right next to his. Rivera stated that he saw an individual, whom he later identified in direct testimony as the defendant, look out of the driver's window. He was able to see the individual's face for approximately 10 seconds. Rivera then saw a hand holding a gun protrude from the driver's window followed shortly by a flash. Rivera ducked and ran approximately 10 or 15 feet. Multiple shots were fired. After the shots were fired, Rivera saw the car go east to the corner and then turn left onto Spaulding.

Deandre Jackson testified that he first noticed the car approximately a hundred feet away as it was traveling east on Hirsch Street. Jackson indicated that the car stopped within three feet of Rivera's car. He described the car as gray with a blue top and tinted windows. Jackson stated that he saw an individual, whom he later identified in open court as the defendant, in the driver's seat of the car for four to five seconds. Jackson jumped to the ground when the shooting began. He remained on the ground until the shooting was over. He then observed the car traveling down Hirsch Street and turn left onto Spaulding.

Nathan Iverson testified that he first saw the car when it was within three to five feet of him. His description of the car was similar to that of Jackson and Rivera. He did not identify anyone as the individual who fired the gun.

Edwin Lopez testified that he was walking south on Homan Avenue toward Hirsch Street at approximately midnight on September 3, 1990. Lopez indicated that

there are three streets between North Avenue and Hirsch Street: Pierce, LeMoyne and Beach. Lopez stated that he was located between Pierce and LeMoyne when he heard six gunshots. Approximately 15 to 30 seconds later, Lopez arrived at the corner of Homan and LeMoyne. He observed a car traveling west on LeMoyne. Lopez described the car as "bluish, grayish car, four-door, and blue top."

Two of the men gathered around Rivera's car had been shot. The victim, Rafael Matamoros, had been shot once in the back and once in the right foot. Nathan Iverson was shot once in the right leg and twice in the left leg. Rivera and Jackson took Matamoros to the Norwegian-American Hospital. Matamoros died at the hospital that evening.

Officer William Watts of the Chicago police department spoke to Daniel Rivera and Nathan Iverson at Norwegian-American Hospital. He testified that Daniel Rivera described the shooter as a male, white Hispanic approximately 18 years old. Nathan Iverson agreed with Rivera's description. Deandre Jackson was unable to give a description of the shooter or identify the race of the shooter. Rivera testified that he and a group of his friends who had come to visit Matamoros were shot at when leaving the hospital.

Officer Thomas Finnelly, a gang specialist with the Chicago police department, was assigned to investigate the murder of Rafael Matamoros. On September 5, 1990, at approximately 12:30 p.m., Officer Finnelly was driving an unmarked police car westbound on Courtland Avenue. He observed a car matching the description of the car used in the shooting. He followed the car until it pulled over and parked. An individual, later identified as the defendant, stepped out of the car and spoke to Officer Finnelly. Officer Finnelly testified that the defendant told him he was a former Imperial

Gangster. The defendant then voluntarily accompanied Officer Finnelly to Area 5 headquarters.

The defendant was placed in a lineup. Daniel Rivera and Deandre Jackson viewed the lineup separately. Both witnesses identified the defendant as the individual in the driver's seat of the car used in the shooting. Daniel Rivera and Deandre Jackson also identified a photo of defendant's car as the car used in the shooting on September 3, 1990.

Defendant Jose Colon was charged with the murder of Rafael Matamoros and the attempted murder of Nathan Iverson, both resulting from the shooting incident of September 3, 1990. At an earlier trial a jury found the defendant not guilty of attempted murder but was unable to reach a verdict as to the murder charge. At his second trial, the defendant was found guilty of murder and sentenced to 50 years' imprisonment. The appellate court reversed the trial court's conviction and remanded for a new trial.

As grounds for reversing the appellate court, the State first argues that the circuit court did not err in admitting evidence of gang motive. According to the State, such evidence was admissible because the evidence provided a motive for an otherwise inexplicable act. (*People v. Smith* (1990), 141 Ill. 2d 40, 58.) The gang-related evidence admitted at trial here was that Daniel Rivera, Deandre Jackson, Marvin King, Nathan Iverson and Edwin Lopez are all members of the Latin Kings street gang. However, the victim, Rafael Matamoros, was not a gang member. Officer Dombkowski testified that on September 2, 1990, the day before the shooting, he had a conversation with defendant Jose Colon. The defendant told Officer Dombkowski that he was a member of the Imperial Gangsters street gang. Officer Finnelly testified that on September 5, 1990, the defendant told him he was a former Imperial Gangster.

Officer Finnelly and Daniel Rivera both testified that Lowell School was in the Latin Kings' territory. Officer Finnelly testified that the defendant informed the officers that he lived in the 900 block of North Sacramento. Officer Finnelly and Daniel Rivera both testified that 911 North Sacramento was in the Imperial Gangsters' territory. Officer Finnelly, Rivera and Lopez all testified that Norwegian-American Hospital is located in the Dragons' street gang territory. The same three witnesses stated that there are two principal gang organizations in existence; the "People" and the "Folks." All three also testified that the Latin Kings are affiliated with the "People," and the Imperial Gangsters and Dragons are affiliated with the "Folks." Daniel Rivera testified that the "People" and the "Folks" do not get along. Edwin Lopez testified that the "People" and the "Folks" are "in opposition."

The above testimony was clearly relevant to establish that the motive for the shooting was generally one of gang rivalry. In *People v. Gonzalez* (1991), 142 Ill. 2d 481, 489-90, this court held that a trial court's decision to admit gang evidence will not be overturned on appeal unless a clear abuse of discretion is shown. Here, the trial court entertained a motion *in limine* by the defense to exclude the gang-related evidence. The trial court heard arguments from both the State and the defense. The court subsequently denied the motion. Given the facts presented in this case, we cannot say the trial court abused its discretion.

Applying the same principles to the evidence introduced concerning the second shooting outside Norwegian-American Hospital, we hold that the evidence was insufficient to prove that the second shooting was gang-related. The trial court allowed evidence concerning the second shooting on a limited basis. The trial court held that the evidence was only admissible to

establish the gang territory that Norwegian-American Hospital was in. Daniel Rivera testified that he and his friends were shot at while they were leaving the hospital. As previously noted, State witnesses Rivera, Lopez and Officer Finnelly testified that the hospital was in Dragon territory. Officer Finnelly testified that Dragons and Imperial Gangsters are allied with the "Folks" organization and the Latin Kings are allied with the "People" organization. Finnelly further testified that the "Folks" and the "People" are "in opposition."

The State argues that the evidence of the second shooting was admissible because it was offered in furtherance of the gang-motivation theory and illustrated the territorial nature of gang warfare. We disagree. Applying *Smith*, 141 Ill. 2d 40, to the present case, we find that the State failed to show even to a slight degree that the second shooting was gang-related. It is undisputed that the shooter at the hospital was unknown. The evidence only showed that those being shot at were Latin King gang members. The mere fact that those individuals shot at were members of a gang that is in conflict with the gang whose territory surrounds Norwegian-American Hospital is not relevant. No evidence was introduced to show that the shooters were members of a gang. This evidence without more does not indicate that the second shooting was gang-related and was therefore improperly admitted.

Although the evidence concerning the second shooting was improperly admitted, we find that it does not warrant reversal of the circuit court's judgment. Witnesses Rivera, Jackson and Iverson all testified that the shots fired at Matamoros were fired from a four-door, gray car with a blue top and tinted windows. Rivera and Jackson also testified that the defendant was seated in the driver's side at that time. Edwin Lopez

testified that he heard six shots 15 to 20 seconds before seeing a four-door, gray car with a blue top speeding west on LeMoyne Avenue. The car was headed toward Central Park. Evidence was introduced that designated Central Park as Imperial Gangster territory. Defendant was arrested on September 5, 1990, while driving a car matching the description of the car used in the shooting. The same day, witnesses Rivera and Jackson separately identified the defendant in lineups. Rivera also identified the defendant's car in the parking lot as the car used in the drive-by shooting on September 3, 1990.

This court in *People v. Easley* (1992), 148 Ill. 2d 281, 330, held that the erroneous admission at trial of gang evidence does not automatically warrant reversal. However, it has long been held that a reviewing court will not hold that an error is harmless unless the court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. (*People v. Coleman* (1989), 129 Ill. 2d 321, 341.) In light of the overwhelming evidence implicating the defendant, we find the evidence concerning the second shooting was harmless.

Next the State argues that the trial court did not err in giving Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (3d ed. 1992). The instruction stated the following:

> "You have before you evidence that the defendant made a statement relating to the offense charged in the indictment. It is for you to determine whether the defendant made the statement, and, if so, what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

Evidence was introduced that the defendant made two statements which were the basis for the instruction. Officer Dombkowski testified that the defendant told him that he was an Imperial Gangster on September 2,

1990. Officer Finnelly testified that on September 5, 1990, the defendant stated that he was a former Imperial Gangster.

The appellate court here found that the instructions were improperly admitted as part of the gang-related evidence testimony. However, as we have discussed, we find the gang-related evidence introduced here was proper. Accordingly, this rationale for challenging the instruction is not valid.

The defense now argues that the instruction is improper because the portion which read "relating to the offense charged" resolved the factual question for the jury of whether the shooting was gang-related. The defense further maintains that this instruction was an adoption by the trial court of the State's theory of the case. We find that it is not necessary for this court to decide this issue. The State argues that the defendant waived this issue on appeal by failing to make the same objection to the instruction as set out in his initial brief before the appellate court. The defense concedes that the objection to the instruction now argued is not the same as raised below. It is well established that issues not raised and argued before the appellate court are treated as waived. (*Meyers v. Kissner* (1992), 149 Ill. 2d 1, 8.) We find that this issue is waived, and we further conclude that it does not rise to the level of plain error.

The State next argues that the appellate court erred in finding that the defendant was denied a fair trial by the introduction of hearsay evidence. Detective Paulnitsky testified that he conducted a lineup on September 5, 1990. On cross-examination, Paulnitsky testified that four individuals viewed the lineup: Daniel Rivera, Deandre Jackson, Gabriel Gonzalez and Marvin King. Neither Gonzalez nor King testified at trial. The following line of questioning occurred on redirect examination of detective Paulnitsky:

"Q. [Assistant State's Attorney]: On the lineup on September 5, counsel asked you about Gabriel Gonzalez and Marvin King again, do you recall that question?

A. Yes.

Q. All right. Did they, in fact, view the lineup on September 5?

A. Yes.

Q. Did any of those individuals make an identification; yes or no?

MR. ASTRELLA [Defense attorney]: Objection. Objection.

THE COURT: I'll let the witness answer.

A. Yes.

Q. MR. BURNETT [Assistant State's Attorney]: After your investigation was completed on September 5 of 1990, detective, was anyone arrested and charged with first degree murder?

A. Jose Colon."

The defense maintains that the above testimony constituted impermissible hearsay. The defense argues that the above testimony informed the jury that either Gonzalez, King or both identified the defendant. The defense maintains that this error was perpetuated because the jury was informed that the defendant was the only individual charged with the shooting.

Although the testimony may have been hearsay, we find that the error here was harmless. In determining whether an error is harmless, the reviewing court will consider the effect that the unlawfully admitted evidence had on the properly admitted evidence. (*People v. Coleman* (1989), 129 Ill. 2d 321, 341.) The appellate court has held that hearsay identification is reversible error only when it serves as a substitute for courtroom identification or when it is used to strengthen or corroborate a weak identification. If, however, the testimony is merely cumulative or is supported by a positive identification and by other corroborative circumstances, it constitutes harmless error. (See *People v. Johnson* (1990), 202 Ill. App. 3d 417, 426.) We find here that the defen-

dant was positively identified by two other witnesses in addition to a substantial amount of corroborative evidence. The admission of this hearsay evidence was therefore cumulative and constituted harmless error.

For the aforesaid reasons, the judgment of the appellate court is reversed, and the cause is remanded to the appellate court for consideration of the sentencing issue raised by the defendant but left undecided by that court.

*Appellate court reversed;*
*cause remanded.*

JUSTICE McMORROW, dissenting:

The primary issue presented in this case is whether the admission of evidence concerning gang membership and the State's use of that evidence was so prejudicial as to deprive defendant of a fair trial and due process. The majority today holds that evidence of gang membership and the occurrence of the crime in the territorial turf of a rival gang to that of which defendant is a member is relevant to show motive for an otherwise inexplicable crime. The appellate court in this case held, "We reverse defendant's conviction because the State improperly introduced extensive gang evidence without the proper showing of relevancy and *continually* promoted a gang motive for the shooting so that evidence of gang membership *completely* pervaded defendant's trial and deprived defendant of a fair and impartial hearing." (Emphasis added.) 249 Ill. App. 3d 141, 143.

The majority reverses the appellate court, holding, in effect, that even in the absence of a showing that gang evidence was relevant, the mere fact, established by police testimony, that defendant was a member or past member of a gang, and that the crime occurred in rival gang territory, is sufficient to justify the introduction of extensive prejudicial gang testimony, jury

instructions, and argument to provide a motive for the crime. On the law applicable to the facts of this case, the majority holding is contrary to established precedent of this court. Further, the erroneous admission of gang evidence and jury instructions to support the State's theory was not harmless error. For these reasons, I dissent.

The gang evidence admitted at trial, and noted in the majority opinion, was comprised of the following: the State witnesses to the crime were all members of the Latin Kings street gang; the murder victim was not a member of any gang; the defendant told a police officer the day before the shooting that he was a member of the Imperial Gangsters street gang; and the second day after the shooting the defendant told another officer that he was a former member of the Imperial Gangsters gang; the shooting occurred in front of a school which was located in Latin Kings gang territory; defendant's home was located in Imperial Gangsters territory; the hospital where the murder victim was taken was located in Imperial Gangsters territory; and the Latin Kings and Imperial Gangsters gangs are rivals, or in opposition to each other. On the basis of the foregoing, the trial court and majority of this court conclude that a gang motive for the murder may be established.

However, the record is devoid of *any* evidence that this crime was gang motivated: *at no time*—before, during, or after the shooting in the instant case—was there any indication that the crime was gang related or motivated. There was no evidence of gang signs or gang symbols. There was no evidence of defendant's participation in or knowledge of a gang conspiracy or prior meetings with gang members. There was no evidence that the shootings or killing was planned by a gang; there was no evidence of gang retaliation for rival gang members' aggression or violence. There is *nothing* in

the record to indicate or remotely suggest that the shootings were gang endorsed. Thus, the evidence of gang membership and the territorial turfs of the opposing gangs was not legally relevant and should have been excluded.

In the instant case, the evidence connecting defendant to gang activity was admitted through the testimony of two officers who claimed that defendant admitted being a past or current member of a gang which is rival to that of the victims. Does the circumstance that defendant's home or the hospital to which the victims were taken happened to be in a location that was "controlled" by the Imperial Gangsters, or that he belonged to that gang, provide a proper basis on which to permit the jury to infer that defendant participated in an Imperial Gangster-related drive-by shooting of a group of Hispanics in a Latin King neighborhood? Stated another way, the ultimate question is whether it is relevant to admit police officers' opinion testimony, derived from their general knowledge of gangs' territories and hostilities, as bearing on a given defendant's state of mind, *i.e.*, motive, for an act such as a drive-by shooting, in the absence of any independent evidence of that defendant's motive.

In *People v. Smith* (1990), 141 Ill. 2d 40, this court held that the State was required to prove the defendant's *knowledge* of the gang's plan before the State could use gang-related evidence as bearing on defendant's motive for the crime charged. In the case at bar, the State offered no evidence that defendant had knowledge of a gang plan. No gang plan evidence was introduced at trial. The existence of generalized gang rivalry over territory and the unstated assumption that some gang members engage in drive-by shootings to carry out gang wars have been substituted by the majority for the concrete link, established in *Smith*, that must be made

between *this* defendant and the crime of which he is accused. (See also *People v. Easley* (1992), 148 Ill. 2d 281, 324-32 (where this court held that evidence relating to prison gangs should not have been admitted because the State failed to establish defendant's participation in and knowledge of an alleged gang conspiracy to kill the victim); *cf. People v. Lucas* (1992), 151 Ill. 2d 461, 479 (holding that the State adequately demonstrated the relevance of defendant's gang-related motive by presenting evidence that defendant admitted his membership in the gang, he knew of the plan to retaliate against prison officials for the death of another gang member, and he had attended a meeting where the conspiracy was discussed).) In *People v. Maldonado* (1992), 240 Ill. App. 3d 470, 476-77, the court cited to *Smith, Easley* and *Lucas* and noted that, in cases where evidence of gang membership has been held to be admissible, the factual circumstances "revealed substantial gang-induced involvement in the crime coupled with the accused's knowledge of those facts."

In *People v. Goldsberry* (1994), 259 Ill. App. 3d 11, the appellate court reversed a defendant's conviction for second degree murder because of the trial court's erroneous denial of the defendant's motion *in limine* to exclude his notebooks, which contained depictions of gang insignia and rap lyrics with gang themes. The court noted that the State failed to show how the notebooks, which implied gang membership, established a *motive* for the murder. The majority opinion held that the challenge to evidence which is purportedly offered to prove motive requires the circuit court to determine "whether defendant's gang affiliation *is related to the crime charged*." (Emphasis in original.) (*Goldsberry*, 259 Ill. App. 3d at 16, citing *Smith*, 141 Ill. 2d at 58; *People v. Rivera* (1986), 145 Ill. App. 3d 609, 618.) The court found that even though the contents of defendant's

notebooks were, according to a State's expert, "consistent" with defendant's membership in a gang which was rival to that of the shooting victim, no evidence linked a gang motive to defendant's shooting of the victim.

The majority's holding in the case at bar is couched in terms of deferring to the trial court's discretion in admitting the gang testimony. The majority cites *Smith* in support of its holding that evidence of gang motive was admissible because the evidence "provided a motive for an otherwise inexplicable act." *Smith* does not stand for such a sweeping principle. On the contrary, the *Smith* court reversed a conviction obtained by the State's introduction of gang-related evidence to support its motive theory. Moreover, the majority selectively fails to state that in the sentence immediately following that upon which the majority relies, the *Smith* court stated: "Such evidence, however, is *only admissible where there is sufficient proof that such membership or activity is related to the crime charged.*" (Emphasis added.) (*Smith,* 141 Ill. 2d at 58, citing, *e.g., People v. Hairston* (1970), 46 Ill. 2d 348, 372.) The majority opinion's omission of the second sentence leaves the impression that if a shooting appears to be random or motiveless, all that is required to establish the relationship of a gang motive to the crime charged is evidence that the shooting occurred on the turf of one gang, and that the defendant was affiliated with a rival gang. The *Easley* and *Smith* cases have rejected the automatic assumption of guilt based on membership in undesirable groups.

In a proper case, gang-related evidence should be admitted. If the prosecutor introduces evidence linking the crime with which defendant is charged to specific gang action, and if the evidence shows that defendant was aware that gang activity was involved, then the gang-related evidence is admissible. (*Lucas,* 151 Ill. 2d 461; *People v. Johnson* (1994), 159 Ill. 2d 97.) Conversely,

where the evidence does not link the crime in any way to specific gang antisocial activity, or where the evidence does not show that defendant was aware that gang activity was involved, then introduction by the State of gang-related evidence to supply a gang motive to an otherwise inexplicable act is improper and highly prejudicial to defendant. See 1 S. Gard, Illinois Evidence Manual Rules 4:03, 4:04, at 152-54 (2d ed. 1979).

Not only is the probative value of such evidence outweighed by its prejudicial impact, this inflammatory evidence permits the jury to draw insupportable inferences of guilt by association. Such evidence may be violative of defendant's first and fourteenth amendment associational rights under the Federal Constitution, if defendant's gang association had no bearing or connection to the crime (see *Dawson v. Delaware* (1992), 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093). In *Dawson*, the United States Supreme Court, with eight Justices concurring, noted that the first amendment protects an individual's right to join groups and associate with others holding similar beliefs. After noting that a defendant's right to associate with a gang is constitutionally protected, although not without limitation, the Court held that defendant's membership in the Aryan Brotherhood, a white supremist gang active in many prisons, including where defendant Dawson was imprisoned, was not tied in any way to the murder and shooting of which he was convicted. The defendant's Aryan Brotherhood membership proved nothing more than the defendant's abstract beliefs. The Court held that defendant Dawson's first and fourteenth amendment rights were violated by the admission of evidence that defendant was a member of the Aryan Brotherhood and that the evidence *had no relevance* to the issues being decided in the proceedings.

Was admission of gang membership, rival gangs,

and gang territory evidence harmless error in this case? Clearly, it was not. The majority characterizes the evidence in this case as "overwhelming." (162 Ill. 2d at 32.) I disagree. The first trial resulted in an acquittal on the attempted murder charge, and a hung jury on the murder charge. No physical evidence against the defendant was introduced at trial to tie defendant to the crime. The murder weapon was not produced. When defendant was stopped while driving his car and asked to go to the police station, police described him as polite and cooperative; he informed them he wished to notify his employer that he would be detained. The record discloses no inculpatory statements by defendant regarding the shooting incident. The only statements police attributed to defendant related to his current and past membership in the Imperial Gangsters street gang.

The identification evidence was conflicting, unconvincing, and its credibility questionable. Particularly troublesome is the evidence regarding identification of the defendant as the shooter. The crime took place close to midnight, and the evidence with respect to lighting at the scene was conflicting. The defendant was identified as the driver of the car, under questionable circumstances, by members of a rival gang. The occurrence witnesses' ability to observe the driver of the car and the other occupants was disputed. After the shooting, the occurrence witnesses drove the victim to the hospital and spoke to police investigators. The statements the witnesses gave to the police at the hospital were inconsistent in many respects from their testimony at trial. None of the State's witnesses knew the defendant, and none described, in the aftermath of the shooting, such features as his moustache and rather long hair. The State's witnesses merely testified that the shots came from the driver's side window of the car.

Deandre Jackson testified he saw the barrel of the

gun, but not the handle. He admitted he did not see the actual shooting. Jackson's identification of defendant as the driver was supported by his claim that he saw defendant's face, before the shooting, for four to five seconds, from 10 to 12 feet away. However, Deandre Jackson was not able to provide the investigating police officers with a description of the offender, or even his race. Deandre Jackson testified at the first trial he saw other people in the car, but was not able to identify them. At the first trial, Jackson admitted he could not see others in the car "because everything happened too fast." In the instant trial, Jackson insisted he was able to observe defendant in the driver's seat, because after the multiple shots rang out, those at the scene of the crime fell to the ground or fled, but he, Jackson, stood up, in full view of the car and shooter, to observe while the car remained there for approximately 10 seconds before leaving the shooting scene. This testimony appears to be highly questionable, in view of other testimony that the car sped off and travelled about $2^1/2$ blocks in the seconds following the shooting. It is also difficult to reconcile Jackson's claim of observing defendant for 10 seconds following the shooting with his statement to Detective Johnson that he could not even determine the race of the driver of the car.

At the hospital following the shooting, Daniel Rivera told Detective Johnson that he saw "two male white Hispanics in the front seat with the driver shooting." At trial, Rivera testified that he saw a man whom he did not recognize put his head out the window of the car from which the shooting occurred, and that he viewed him for approximately 10 seconds. However, during cross-examination, Rivera's credibility was impeached by his conflicting answers when asked whether he saw who was firing the gun: he said he saw the driver stick his head out of the window; he claimed that he saw who

was firing; then he said he saw the gun, but not the face of the individual who was firing the pistol. Rivera was further impeached by his statements from the prior hearing, that he did not see any shots being fired. Nathan Iverson, another witness to the shooting, was unable to make an identification.

All of the State's occurrence witnesses admitted to having robbery convictions or pending charges, and all admitted their membership in the Latin Kings, a rival gang of the Imperial Gangsters street gang, to which defendant may have belonged.

The police conducted two lineups in this case. In the first lineup, which was conducted on September 4, the day following the shooting, the lineup consisted of five black males. There were no Hispanics in this lineup. The record indicates that Gabriel Gonzales, who did not testify at Colon's trial, identified one of the men in this lineup as a passenger in the rear of the car involved in the shooting.

On September 5, the police conducted a second lineup, which included defendant and other Hispanic males. Defendant was identified in that lineup by Rivera and Jackson, even though their opportunity to view the shooter had been extremely limited, and even though the day prior to the lineup identification, Jackson could not describe the shooter, or even identify the race of the shooter.

Over defense objections at trial, the court allowed the State to ask Officer Paulnitsky whether Gabriel Gonzales and Marvin King, individuals who were at the scene of the shooting but who did not testify at trial, made an identification during the second lineup on September 5. The police officer responded, "Yes." Since the defendant was charged and on trial for the murder, the jury would be prompted to believe that King and Gonzales had identified the defendant in the lineup.

This hearsay identification of defendant, which was not subject to cross-examination, was error capable of causing significant prejudice to defendant. The evidence was not closely balanced, and the error should not be characterized as harmless.

The majority opinion in the instant case, without identifying the basis for its conclusion that the evidence against defendant was overwhelming, and without discussing the discrepancies and impeachments in the evidence, merely states that the evidence against Colon was "overwhelming." The appellate court did not think so. The first jury (the "hung" jury that acquitted Colon of attempted murder) apparently did not think the evidence was overwhelming, either. Nor do I think the evidence was overwhelming. The evidence linking Colon to the shooting does not appear so overwhelming as to render harmless the State's injection of gang evidence into the trial.

I agree with the majority that the evidence of the second alleged drive-by shooting, at the hospital, was improperly introduced because the defendant was not charged with that shooting, and there was no evidence connecting defendant to that shooting. I agree that the introduction of this evidence was error, but I disagree with the majority's conclusion that the error was harmless.

I agree with the appellate court majority's reasoning that the trial court committed error in its instructions to the jury with regard to statements made by the defendant. No purpose is served for me to elaborate further on that error in this opinion.

The issue before this court is whether defendant received a fair trial. The appellate court majority's review of the record led to its conclusion that the improperly admitted gang evidence pervaded the entire trial. The prosecutor in his opening statement told the

jury that the shooting happened because of gang rivalry and asked the jury "by your verdict to stop the senseless killing." In rebuttal closing, the State told the jury that its verdict "will tell the defendant and the other gangs that this conduct is not tolerated in our city." The jury was invited to put gangs on trial, rather than the individual accused of the crime.

The State's theory of gang-related motive was not supported by the evidence presented at trial. There was nothing in the evidence which, even to a slight degree, establishes the existence of the motive for the crime charged. The cumulative impact of the incompetent evidence of gang membership, territorial gang rivalry, erroneous instructions, and the prosecutor's comments may have prejudiced the jury and constituted a factor in defendant's conviction.

In reversing defendant's conviction on grounds of trial error, the appellate court majority in the case at bar stated: "We follow the supreme court's rulings in *Lucas, Easley* and *Smith* that find there must be sufficient evidence demonstrating that the crime at issue was related to gang involvement or gang activity and that the defendant was aware that gang activity was involved. *Lucas,* 151 Ill. 2d at 480; *Easley,* 148 Ill. 2d at 326; *Smith*, 141 Ill. 2d at 58." 249 Ill. App. 3d at 146-47.

If the majority now rejects this court's own prior analysis concerning the necessity to show the relevance of gang activity on motive, and the defendant's knowledge that gang activity is involved, the majority should state that intention directly. To reverse the appellate court, when it explicitly relied upon precedent of this court, without even explaining why the appellate court erroneously followed this court's reasoning, muddles the law that applies to the admission of gang-related evidence.

*Smith, Easley*, and *Lucas* provide the architecture

for a solid analytical structure, designed around basic principles of evidence and fair trial, to guide the courts of this State in ruling on the admissibility of gang-related evidence. The majority ignores the rationale of these cases by simply declaring the challenged evidence in the case at bar admissible as relevant to provide a general motive of gang warfare. However, the existence of generalized gang rivalry over territory has been improperly substituted by the majority for the concrete link that must be made between the particular defendant on trial, the crime of which he is accused, and gang connection.

The Supreme Court of Illinois has in the past acknowledged that the highly prejudicial nature of gang evidence requires that a proffered gang motive must be tied to the crime charged, instead of appealing to the public's fear and general loathing of gangs. (*E.g., Smith.*) Given the climate of the times and the serious gang problems in Chicago, it is easy to recite in the instant case, as did the majority, that the trial court did not "abuse its discretion." But that merely begs the issue presented in the instant case. By failing to analyze this court's heretofore controlling precedents on the admissibility of gang-related motive evidence and failing to provide a reasoned ground for departing therefrom, the majority abdicates its guiding role and leaves the courts and lawyers of this State uncertain as to whether this court is adopting a new, ill-defined—or totally undefined—standard which permits the admission at trial of gang-related evidence, based solely on a defendant's alleged membership in a gang and his location in a rival gang's territory during the commission of the crime, to supply a motive for the crime. The uncertainty created by the majority's ruling is exacerbated by the fact that the appellate court, in its explicit reliance upon this court's pronouncements in *Smith, Easley* and *Lucas,*

has been reversed. The principles and viability of those cases has now become questionable. When a case such as the one at bar presents itself for judicial evaluation, the bar and bench deserve a more thorough analysis than the ruling by judicial fiat presented in the majority opinion.

This court's rulings in *Smith, Easley,* and *Lucas* are consistent with principles of due process and fair trial. Unlike the majority, I adhere to the prior rulings established by this court in those cases. The appellate court's holding that defendant is entitled to a new trial should be affirmed.

For the foregoing reasons, I respectfully dissent.