# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Weston*, 2011 IL App (1st) 092432

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRAVIS WESTON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-2432 |
| Filed | August 12, 2011 |
| Rehearing denied | September 6, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Although the trial court erred in admitting gang-related evidence without a demonstration of its relevance, the overwhelming evidence of defendant's guilt rendered the error harmless and defendant's convictions for first degree murder and attempted murder were affirmed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-24410; the Hon. Neera Lall Walsh, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Elena B. Penick, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Mary Needham, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE GARCIA delivered the judgment of the court, with opinion.

Justices Cahill and McBride concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Travis Weston was convicted of first degree murder and attempted murder and sentenced to consecutive terms of imprisonment of 45 and 30 years, respectively. Before the defendant's jury trial, the trial court granted the State's motion to admit evidence of the defendant's gang affiliation to "provide a motive for what would otherwise be an inexplicable act." However, no evidence connecting the defendant's gang membership to the crimes was ever presented and the trial evidence made patently clear the defendant committed the crimes to aid his cousin. On the record before us, we are compelled to find the trial court abused its discretion in allowing gang-related evidence, where the State made no showing that the gang-related evidence was germane to the charges and the case law offered by the State was inapposite. Nevertheless, evidence of the defendant's guilt was overwhelming, where the victim was very familiar with the defendant and the defendant confirmed in a conversation he had with an independent witness that he was familiar with the victim. The overwhelming evidence closed the door to the defendant's claims of plain error grounded on the State's remarks during closing argument. We affirm.

¶ 2                                  BACKGROUND

¶ 3    The defendant and his brother Brian Weston were tried simultaneously, but before separate juries, for the April 30, 2005, shootings of Tai Williams, who was killed, and Nyoka Williams, her sister, who lived to testify at trial against both defendants. We recently affirmed Brian Weston's conviction for first degree murder and attempted murder. *People v. Weston*, No. 1-09-2122 (2011) (unpublished order under Supreme Court Rule 23).

¶ 4    Nyoka testified that in 2004, she began dating William Yelvington, whom she knew as William Jackson. Yelvington introduced Nyoka to his cousin, the defendant. Nyoka interacted with the defendant on 10 or 11 separate occasions, including the times she accompanied Yelvington to the defendant's residence. In September 2004, Nyoka and Yelvington ended their relationship. Nyoka moved in with her sister Tai and Tai's son on East 50th Place in Chicago. Nyoka resumed dating Yelvington in early 2005, but recurrent

-2-

arguments soon ended the relationship. Around April 4, 2005, Nyoka came home to find Yelvington and the defendant in her bedroom with multiple "long" guns laid out on her bed. She asked Yelvington to remove the guns, which he did. On April 11, 2005, Yelvington broke into her apartment through a window and refused her requests to leave. Yelvington pointed a long gun at Nyoka, threatening to kill her if she called the police. She ignored the threat and called 911, which prompted Yelvington to run out of the apartment. She recognized the long gun Yelvington pointed at her as among the guns he had laid out on her bed the week earlier. Nyoka obtained an order of protection that barred Yelvington from entering her building.

¶ 5    On April 12, 2005, the police recovered a number of weapons and ammunition from a dumpster about a block from Nyoka and Tai's residence. There were two 12-gauge pump-action shotguns and three rifles, one of which had a bipod support stand attached to the barrel. The police search for weapons was triggered by an anonymous phone call. In an interview with Chicago Detective Jean Romic on May 4, 2005, Nyoka recognized from a photo the rifle with the bipod as the gun Yelvington pointed at her on April 11.

¶ 6    On April 29, 2005, Nyoka was home with her sister Tai. Nyoka was watching television in her bedroom while Tai was watching television and talking on the phone in the living room. The doorbell rang. The man at the intercom said he lived across the hall and needed to be let in. Nyoka told the man to contact the landlord. She observed through a window that the person at the intercom was a young black man in a gray, hooded sweatshirt. She told Tai she did not feel safe. She checked the locks to the apartment and fell asleep in her room on top of her bed covers with both the television and a closet light on.

¶ 7    In the very early morning, Nyoka awoke to a man standing directly over her, holding a silver gun with a white handle in her face. It looked like a "cowboy" gun to Nyoka. The man was wearing a gray, hooded sweatshirt, had "short, nappy afro" hair, and was about 5 feet 6 inches or 5 feet 7 inches in height. He yelled, "where those things at." When Nyoka sat up, the defendant walked into her bedroom with Tai, who sat next to Nyoka on the bed. The man with the gun continued to ask, "where is William's guns at." Nyoka responded that she did not know what the man was talking about; she said Yelvington had taken all of his possessions when he moved out of her apartment. The defendant left the room for a couple of seconds, during which time Nyoka testified the man with the gun was "steady asking me where the fuck is William's guns at." The defendant returned to the room with two pillows from Nyoka's couch. He addressed Nyoka by her nickname, "Cookie, where the fuck them things at." She responded, "Travis, you know that William took everything with him."[1]

¶ 8    When Tai began repeating what Nyoka said, the gunman threatened to shoot her for talking too loudly. The defendant attempted to put one of the pillows over Tai's face, while the gunman aimed the gun at her face. Nyoka then stood up, which prompted the gunman to hit her in the face with the gun, shove her to the floor, and shoot her in the back of the head. Nyoka heard her sister scream, "my arm, my arm," and heard two more shots. While Nyoka

---

[1]No reason was offered at trial for the defendant and his brother looking for Yelvington's guns at Nyoka's apartment.

was lying on the floor, she heard the defendant say, "shoot that bitch again," at which point Nyoka was shot in the shoulder. After the two men left, Nyoka called 911 on her cell phone. She was hospitalized with two through-and-through gunshot wounds: one to the base of her skull at her neck; the other to her left upper shoulder. Tai died from the gunshots wounds she received.

¶ 9 Chicago police officer Carl Brasic testified he arrived at the East 50th Place apartment at 4:20 a.m. on April 30, 2005. He found the rear door of the apartment forced open. He recovered a fired bullet and metal fragment from the bedroom where the shootings occurred. Another bullet was recovered in the basement beneath Nyoka's bedroom. He recovered no guns from the scene.

¶ 10 Following an interview of Nyoka at the hospital, Detective Romic began looking for a black male known as Travis. On May 3, Detective Romic presented Nyoka with an array of 11 photographs from which she identified the defendant as one of the men that broke into her home. The following day, she identified the defendant from a lineup at the police station. According to Detective Michael Adams, Nyoka later identified the defendant's brother, Brian Weston, as the gunman from a photo array and at a lineup. She identified both the defendant and Brian Weston in court during the trials.

¶ 11 Rannell Colbert, a 26-year-old female, also testified for the State. Colbert knew the defendant from grade school, but had lost touch with him over the years. By April 2005, they had reconnected and had been friends for some time, with the defendant sleeping at Colbert's home on the sofa. Colbert came to know the defendant's cousin, Yelvington, by the name of "LC." Around mid-April, the defendant said to Colbert, " 'Sis, I might need you to beat LC's bitch up for me.' " When Colbert asked why, the defendant said, " 'man, that bitch turned some thumpers in to the peoples.' " The defendant added, " 'if they catch LC, man, my cousin going to be gone for life. They going to slam him.' " According to Colbert, "thumpers" meant guns and "LC's bitch" referred to the woman LC was dating. On the day before the shooting, Colbert went to a party around 9:30 p.m. The defendant was not home when she returned around 2:30 or 3 a.m. the next day. He was not there when she awoke at noon. She went to another party the night of April 30. When she came home around 3 a.m., the defendant was home. When she asked where he had been, the defendant responded that he had been "hanging out." At some point that morning, the defendant walked through Colbert's house putting his belongings in a plastic bag and left. Colbert saw the defendant a few days later, when she gave him a ride to her cousin's house. She did not see the defendant again until the trial.

¶ 12 The parties stipulated to the DNA evidence. The forensic analyst would testify that the defendant and his brother were excluded as contributors to the DNA mixture recovered under Tai's fingernails.

¶ 13 Before trial, the State filed a motion to admit evidence that the defendant was a member of a gang. The State argued the defendant and Yelvington were members of the gang known as Unknown Vice Lords and the defendant committed the crimes in an attempt to recover weapons for the gang. The motion stated:

"The nature of the weapons, that they had been in the custody and control of

defendant's fellow gang member (William [Yelvington]), and were now inaccessible, is the motive for the forced entry of victim[']s residence, their interrogation, and ultimately their shooting. The gang evidence is clearly relevant to show the motive is defendant's recovery of his fellow gang member[']s weapons cache, if not weapons belonging to the gang itself."

¶ 14   At oral argument on the motion on June 29, 2009, the State contended evidence of the defendant's gang affiliation should be admitted to "provide a motive for what would otherwise be an inexplicable act." Counsel for the defendant countered that Yelvington and the defendant were cousins, "So it's a familial thing going on here." Counsel stated that "alleged gang members also have families, also do things for other reasons. What the State has to prove here is that this whole crime has to do with something related to the organization that they call a gang. They haven't done that." Defense counsel concluded, "just because a person is in a gang or alleged to be in a gang doesn't mean the activity they are carrying out has to do with a gang."

¶ 15   The trial court explained its ruling:

"[I]t is *** a balancing test as to whether there would be more prejudice than probative value here; and I believe that in this case, based on the cases that were cited by the State, in particular People versus Gonzalez, I do believe that the State has met their burden here, and it would be more probative than prejudicial to the defendant."

¶ 16   At trial, Nyoka testified the defendant and Yelvington addressed each other as "Lord," which she understood to mean "Vice Lord." When Colbert was also asked about the defendant's gang membership, she testified, "I didn't never known for Travis to belong to a street gang. *** [J]ust the environment of which I knew he hung out in, I do know that was gang related." When asked what environment she referred to, she explained, "I known some of them to say Unknown Vice Lord," which she identified as the name of a street gang.

¶ 17   At closing argument, the State pointed to "guns in the world of gangs," which can link gang members to past crimes. The jury found the defendant guilty of first degree murder and attempted murder. In his motion for a new trial, the defendant contended, among other claims, that gang evidence should not have been admitted and that Nyoka should not have been permitted to opine on the meaning of the term "Lord." The court denied the posttrial motion and imposed consecutive sentences of 45 for first degree murder and 30 years for attempted murder. The court denied his motion to reconsider the sentence. This timely appeal followed.

¶ 18                                           ANALYSIS

¶ 19   The defendant argues the circuit court erred in allowing the introduction of gang-related testimony by Nyoka and Colbert as the probative value of that testimony was substantially outweighed by its prejudicial impact. Specifically, he contends Nyoka was not qualified to give lay testimony about the meaning of the term "Lord," as used by the defendant and Yelvington, and Colbert's testimony, that the defendant and his group were known to say "Unknown Vice Lord," was hearsay. He also asserts the court's ruling, permitting gang-related testimony, opened the door to the State's closing argument that ridiculed the defense

and invited speculation about other crimes the "gang members" might have committed.

¶ 20    In response, the State persists in its contention that a motive behind the crimes was gang-related, which made the evidence of gang affiliation relevant to explain the shootings. As a fall-back position, the State claims that even without the gang evidence, the evidence was sufficient to affirm the conviction. As to the defendant's arguments regarding its closing argument, the State contends the defendant did not preserve his contentions of error by objecting, except as to one comment. The State notes the lone comment objected to was not listed in the defendant's posttrial motion; in any event, the lone comment does not warrant reversal.

¶ 21                                                    Gang Evidence

¶ 22    "[A]ny evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased." *People v. Smith*, 141 Ill. 2d 40, 56 (1990). "It is generally held that evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible *** to provide a motive for an otherwise inexplicable act." *Id.* at 58. Trial courts are cautioned, however, that "street gangs are regarded with considerable disfavor by other segments of our society. [Citation.] *** [P]articularly in metropolitan areas, there may be strong prejudice against street gangs." *People v. Strain*, 194 Ill. 2d 467, 477 (2000). "Trial courts should exercise great care in exercising their discretion to admit gang-related testimony." *People v. Davenport*, 301 Ill. App. 3d 143, 152 (1998) (citing *People v. Lucas*, 151 Ill. 2d 461, 487-89 (1992)).

¶ 23    The standard for admitting gang evidence has been set by our supreme court: "[T]his court has held that evidence indicating a defendant is a member of a gang or is involved in gang-related activity is admissible *only* where there is sufficient proof that membership or activity in the gang is related to the crime charged." (Emphasis added.) *Strain*, 194 Ill. 2d at 477. To ensure a careful exercise of discretion, a trial court should require the prosecution to demonstrate a clear connection between the crimes and the gang-related testimony. As our supreme court cautioned in a different context, decisions by courts of review allowing gang-related testimony do not furnish a license to the trial courts "to adopt a cursory or skeletal analysis of the facts and issues" regarding the admission of highly prejudicial gang-related testimony. *People v. Johnson*, 208 Ill. 2d 53, 117 (2003).

¶ 24    It is never sufficient for a trial court to give lip service to the balancing test, while it undertakes no analysis to ensure that the case law offered by the State actually supports the admission of gang-related testimony based on the evidence in the case under consideration. In its ruling granting the State's motion to admit gang-related testimony, the trial court reasoned, "I believe that in this case, based on the cases that were cited by the State, in particular People versus Gonzalez, I do believe that the State has met their burden here, and it would be more probative than prejudicial to the defendant." Yet, the State's motion offered scant reason for its reliance on the case it offered to the trial court. We note that before this court, the State makes little of the case it urged upon the trial court to guide its ruling. Our examination of *People v. Gonzalez*, 142 Ill. 2d 481 (1991), explains why.

¶ 25   In *Gonzalez*, the supreme court reviewed this court's majority decision that reversed the defendant's conviction based on the admission of the defendant's gang affiliation where the evidence was not overwhelming. *Id.* at 485. The trial court had admitted into evidence a photo book of gang members to explain the victim's identification of the defendant. *Id.* at 488. The trial court had "ruled that such evidence would be admissible for the limited purpose of showing the circumstances leading to the defendant's identification as the offender and his subsequent arrest." *Id.* at 485. The supreme court repeated the limited nature of the trial court's ruling: "We first consider whether the gang-related evidence was properly admitted for the limited purpose of showing the circumstances surrounding the victim's identification ***." *Id.* at 487. Our discussion of *Gonzalez* could end here. Given the careful ruling by the trial court in *Gonzalez* limiting the use of gang-related evidence, a limitation acknowledged in the analysis of both the appellate court and the supreme court, we do not see how *Gonzalez* is apposite to the circumstances present in this case. Nor did the trial court explain its reliance on *Gonzalez*.

¶ 26   As we noted above, the State's brief before us fails to cite *Gonzalez* in the course of its argument that the circuit court did not err in admitting the gang-related testimony. We infer from this omission that the State no longer takes the position it advocated before the circuit court. We add for good reason.

¶ 27   "Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Gonzalez*, 142 Ill. 2d at 487-88. As the court made clear in *Gonzalez*, "the reliability of the victim's identification of the defendant as the offender was the central issue in the case. *** To the extent that the gang-related evidence strengthened the victim's identification testimony, the evidence was relevant." *Id.* at 488. The court further explained the relevance of the book containing photographs of the gang to which the defendant belonged. "The gang-related evidence was relevant to the jury's consideration of the steps in the investigation, and of the circumstances culminating in the defendant's arrest as the offender." *Id.* The court made clear that "gang-related evidence will not necessarily be excluded if it is otherwise relevant and admissible." *Id.* at 489.

¶ 28   Thus, the trial court's statement in its ruling admitting the gang evidence based on its assessment of the balancing test missed a more fundamental step. Before gang-related testimony may be admitted, the trial court must first determine that the evidence is *relevant*. Only if the gang-related testimony is relevant would the trial court need to engage in the balancing test. Much as it was absent from the trial court's ruling, the State before us fails to explain the relevance of the gang-related testimony. It is also clear that Nyoka's identification of the defendant was not the central issue before the jury; nor was her familiarity with the defendant strongly disputed. *Gonzalez* is inapposite.

¶ 29   This case is more analogous to the supreme court's decision in *Smith*. There, the State sought to introduce evidence that the murder victim, an assistant prison warden, had been tough on an imprisoned gang leader, and the defendant's affiliation with that gang motivated the defendant to murder the victim. *Smith*, 141 Ill. 2d at 58. "The only evidence admitted in support of this theory, however, indicated that there is a variety of gang-related activity in the Illinois penitentiary system, that [the victim] was intolerant of such activity in the prison

where he was employed, and that [the victim] had had an altercation with [the gang leader] while [the leader] was an inmate." *Id.* "This evidence, by itself, simply does not support a reasonable inference *** that defendant was acting pursuant to the alleged vengeful designs of [the leader] or [the gang] at the time he allegedly killed [the victim]." *Id.* at 59. "As such, the inflammatory evidence of gang-related activity offered to support the 'motive' theory was of little probative value and could do little more than 'excite a suspicion of guilt' in the minds of the jurors." *Id.* (quoting *People v. Gougas*, 410 Ill. 235, 240 (1951)). The supreme court concluded it was error to admit the gang evidence. *Smith*, 141 Ill. 2d at 59.

¶ 30        Our decision in *People v. Joya*, 319 Ill. App. 3d 370 (2001), also bears similarities to the case at hand. In *Joya*, the State contended "evidence of defendant's gang membership was relevant to show that defendant and his fellow gang members shared a common purpose or design," which motivated the defendant to shoot the victim in a bar fight. *Joya*, 319 Ill. App. 3d at 376. The record simply did not support the State's contention.

> "[T]he only evidence that there was any connection between defendant's gang membership and the shooting of [the victim] was *** testimony that, two or three months prior to the shooting, defendant told him that he was a member of the Viking street gang. The evidence in this case showed that the incident was a bar fight and there was absolutely no testimony that anyone mentioned gang involvement in the shooting either prior to or after the shooting. As to the State's argument that the evidence of gang affiliation established a common purpose or design between defendant and his fellow gang members, we note that the shooter, Pedro, was defendant's brother. *The familial relationship between the two is a more reasonable basis upon which to find a common purpose or design.* *** Consequently, any inference that their mutual gang membership supported the State's theory that they acted in concert was cumulative and unnecessary. We find that the evidence of gang membership in this case was not related to the crime charged and that if it had any probative value at all, such value was greatly outweighed by its prejudicial effect. We find that the trial court abused its discretion in admitting the evidence of defendant's gang membership ***." (Emphasis added.) *Id.* at 377.

¶ 31        In the instant case, like the prosecution in *Smith* and *Joya*, the State presented no evidence that the defendant's alleged gang affiliation motivated him to search for weapons in Nyoka's apartment, ultimately resulting in the shootings of the Williams sisters. Rather, as in *Joya*, the "familial relationship" between the defendant and his cousin Yelvington provided the clear explanation for the defendant's actions. *Id.* at 377. Colbert quoted the defendant as stating as much: " '[I]f they catch LC, man, my cousin going to be gone for life.' " Nor did Nyoka ever testify that on the night of the shootings, the defendant and his brother asked about "the gang's guns." To the extent the weapons recovered by the police near Nyoka's apartment could be traced, no evidence was presented that the weapons were connected to the Unknown Vice Lords. The evidence only showed the weapons belonged to Yelvington. It was Yelvington (along with the defendant) who had the guns laid out on Nyoka's bed, and it was Yelvington who later pointed one of weapons at Nyoka. On the night of the crime, the defendant's brother repeatedly asked about "[Yelvington's] guns." As in *Joya*, "there was absolutely no testimony that anyone mentioned gang involvement in the

shooting either prior to or after the shooting." *Joya*, 319 Ill. App. 3d at 377. The evidence in this case supported only that the defendant sought to protect his cousin against the serious consequences that might flow from the police recovery of the weapons. The gang-affiliation testimony was entirely "unnecessary." *Id.* at 377. See *People v. Easley*, 148 Ill. 2d 281, 329 (1992) (that the defendant prison inmate was a gang member and that correctional officers had allegedly killed a fellow gang member inmate did not establish that the defendant's killing of a correctional officer was motivated by gang affiliation, and therefore did not justify admission of gang evidence). The record before us is barren of any evidence that the weapons belonged to the gang.

¶ 32    Nor does the State offer any authority for its contention that *Joya* is somehow distinguishable because the crime in that case was more "spontaneous" than this one. The State fails to explain the role spontaneity (or its absence) has on the admission of gang-related evidence.

¶ 33    The State conceded in closing argument that the defendant's alleged desire to help the gang was at most a secondary motivation. It called the gang motivation "[a] reason to get those guns back independent but in addition to helping out his cousin." We take from this argument that the gang evidence, contrary to the State's claim to the trial court, was unnecessary "to provide a motive for an otherwise *inexplicable act*." (Emphasis added.) *Smith*, 141 Ill. 2d at 58. Once it was clear that the shootings were not gang-related, the State should have refrained from raising gang motivation in its closing argument. *Cf. Johnson*, 208 Ill. 2d at 115 ("Defense counsel's [unjustified] argument did not grant the prosecutor a license to say anything he desired.").

¶ 34    The State's last-ditch effort that there is an "inference" that the guns belonged to the gang is too insubstantial to warrant serious analysis. We note only the State's "inference" contention is an implicit admission that the gang-related evidence failed to directly connect the crimes to the defendant's gang affiliation. See *Smith*, 141 Ill. 2d at 58 ("[Gang evidence] is only admissible where there is sufficient *proof* that such membership or activity is related to the crime charged." (Emphasis added.)); *People v. R.L.*, 158 Ill. 2d 432, 441 (1994) (" '[A]n inference is a working tool, not a synonym for proof.' " (quoting *Personnel Administrator v. Feeney*, 442 U.S. 256, 279 n.25 (1979))).

¶ 35    Finally, we acknowledge that this court in the appeal of the defendant's brother, Brian Weston, rejected his claim of error in the admission of gang evidence. In that case, however, "the trial court limited the State to arguing that only Travis was a gang member." *Weston*, slip op. at 12. No evidence that Brian Weston was a gang member was admitted. *Id.* at 13. "It is less likely that the jury would hold the gang affiliation of [Travis Weston] against [Brian Weston] than it would be had the evidence shown that defendant [Brian Weston] himself was a gang member." *Id.* Hence, our holding of error in this appeal does not conflict with this court's decision in Brian Weston's appeal.

¶ 36    In sum, the evidence clearly demonstrated that the defendant's acts were not inexplicable. He engaged in the course of conduct that resulted in Tai's death and the attempted murder of Nyoka in a failed effort to recover weapons that he may have last seen in Nyoka's apartment, laid out on her bed. As the State acknowledged, the defendant's criminal acts

-9-

were primarily intended to help his cousin. The gang-related testimony did not have any tendency to make the existence of a fact of consequence more or less probable. The testimony was simply irrelevant, with nil probative value. The probative value of irrelevant evidence can never outweigh its prejudicial impact. The circuit court erred in admitting the gang-related testimony when it failed to first determine the proffered evidence was relevant to an issue in the case. It necessarily follows that the circuit court abused its discretion in concluding the probative value of the gang-related testimony exceeded its prejudicial impact.

¶ 37                                                                 Prejudice

¶ 38     The State contends that even if the gang evidence was erroneously admitted, the defendant's convictions should stand because his guilt was overwhelming. The defendant counters that his guilt cannot be considered overwhelming in the absence of physical evidence or a confession. We hold the gang-related evidence did not contribute to the defendant's conviction where the remainder of the evidence was more than sufficient to persuade a reasonable jury of the defendant's guilt beyond a reasonable doubt.

¶ 39     "The erroneous admission at trial of *** gang evidence does not automatically warrant reversal." *Easley*, 148 Ill. 2d at 330 (citing *Smith*, 141 Ill. 2d at 79). Such an error "is harmless where the court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *Davenport*, 301 Ill. App. 3d at 153 (citing *People v. Colon*, 162 Ill. 2d 23, 31-32 (1994)). "The effect of inflammatory evidence depends upon the circumstances of the case." *Easley*, 148 Ill. 2d at 330.

¶ 40     Consistent with the *Easley*, *Davenport*, and *Colon* decisions, the evidence of the instant defendant's gang affiliation was harmless beyond a reasonable doubt. In *Easley*, the trial court allowed "various correctional officers" to testify that the defendant was a gang member. *Easley*, 148 Ill. 2d at 328-29. The supreme court held that the trial court's ruling, while erroneous, did not deprive the defendant of a fair and impartial trial because the jury heard inculpatory eyewitness testimony and had before it physical evidence linking the defendant to the crime. *Id.* at 295, 328-30. In *Davenport*, this court affirmed a defendant's murder conviction in the face of the trial court's "obnoxious" admission of gang evidence because the evidence was "overwhelming" where an independent eyewitness positively identified the defendant, though inculpatory physical evidence was absent. *Davenport*, 301 Ill. App. 3d at 149, 153. Similarly, the supreme court in *Colon* held that improperly admitted gang evidence did "not warrant reversal of the circuit court's judgment" because reliable eyewitness testimony and circumstantial evidence made the evidence "overwhelming," even in the absence of inculpatory physical evidence. *Colon,* 162 Ill. 2d at 31-32, 41.

¶ 41     In the instant case, Nyoka's intrepid character came through in her testimony–testimony which might well have constituted overwhelming proof of the defendant's guilt in the absence of any other incriminating evidence. But the State had more. The testimony of Colbert circumstantially corroborated the blame the defendant directed at Nyoka for the missing weapons. The recovery of the weapons by the police in a dumpster corroborated Nyoka's testimony regarding the sisters' interrogation by the defendant and his brother. In light of this evidence, the unnecessary, but relatively insignificant testimony of the

defendant's gang affiliation was rendered harmless beyond a reasonable doubt.

¶ 42    We dismiss the defendant's insubstantial challenges to Nyoka's testimony based on her testimony as to her work history, her claim that she left the closet light on, her description of the haircut Brian Weston had, and the questions raised regarding who kicked down the door to her apartment as nothing more than an impermissible request that we reweigh the evidence. The unerasable fact is that Nyoka knew the defendant, going so far as to call him "Travis" during the assault on the night in question. See *Weston*, slip op. at 7 (Nyoka's testimony was sufficiently reliable to convict the defendant's brother, whose face was obscured by a hood and whom she did not know prior to the night of the crime).

¶ 43    The overwhelming strength of the State's case only serves to highlight the misguided motion by the State to seek the introduction of gang-related testimony and the circuit court's erroneous decision to be swayed by the State's argument. The specific challenges to the gang-related evidence, regarding Nyoka's testimony on the meaning of "Lord" and regarding Colbert's hearsay testimony, were rendered harmless beyond a reasonable doubt in light of the overwhelming evidence that proved the defendant's guilt beyond a reasonable doubt.

¶ 44                                     Closing Arguments

¶ 45    The defendant's final contention is that he was substantially prejudiced by the State's comments in closing argument. The defendant complains of the following comments by the prosecution:

> "Guns in the world of gangs have attachments, attachments not only to crimes, like to this crime, like the gun that this defendant and his brother, his partner in crime used to extinguish Tai's life and to try to kill Nyoka, they not only have those connections to crimes, they have connections to other crimes because they can be matched up back to things that happened years ago, back to things that happened yesterday, back to things that happened two hours ago."

¶ 46    To preserve an issue for appeal, a defendant must both object at trial and raise the issue in his posttrial motion. Omission of either step results in forfeiture. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). The defendant urges plain error review.

¶ 47    The plain error doctrine permits a reviewing court to address an unpreserved error when (1) the evidence is so closely balanced that a clear and obvious error alone threatened to tip the scales of justice against the defendant, or (2) an error so serious occurred that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 178-79, 186-87 (2005). As we concluded above, the evidence was not close, which forecloses the defendant's plain error claim under the first prong. *People v. Santiago*, 409 Ill. App. 3d 927, 930 n.1 (2011).

¶ 48    We understand the defendant to urge review under the second prong of plain error when he asserts the State "undermined the integrity of the proceedings by disparaging the defense during closing rebuttal." This claim is equally unavailing in the absence of supporting authority. We are unpersuaded that the handful of comments the defendant points to as offensive somehow undermined the integrity of the judicial process when the comments did not trigger an objection by defense counsel. The lone comment the defense counsel objected

to, that his argument "sounded like some kind of psycho babble," could not have caused the defendant substantial prejudice. See *People v. Franklin*, 135 Ill. 2d 78, 112 (1990) (the defendant was not prejudiced by the prosecution's remarks that the defendant's closing arguments were " 'shocking,' " " 'insulting,' " " 'bunk,' " and " 'abominable' ").

¶ 49 Given the thoroughly persuasive testimony of Nyoka, corroborated by the State's other evidence, no reasonable jury could have reached any other verdict but that the defendant was guilty beyond a reasonable doubt of the charged offenses.

¶ 50          CONCLUSION

¶ 51 The trial court abused its discretion in admitting gang-related evidence, as the State failed to demonstrate the relevance of the proffered testimony to warrant its admission. Nonetheless, the highly credible eyewitness testimony against the defendant, which also established his clear motive for the crimes, rendered the circuit court's error harmless beyond a reasonable doubt. In light of the overwhelming incriminating evidence, the defendant's challenges to the State's closing arguments, including claims of plain error, are unavailing.

¶ 52 Affirmed.