THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONNIE FIELDS, Defendant-Appellant.

First District (5th Division)   No. 1—91—3483

Opinion filed March 11, 1994.

Rita A. Fry, Public Defender, of Chicago (Fred Weil, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a jury trial, defendant, Ronnie Fields (Fields), was convicted of armed robbery (720 ILCS 5/18—2 (West 1992)) and sentenced to 30 years' imprisonment. On appeal, Fields argues that: (1) the trial court erred by allowing the jury to receive an exhibit which was not admitted into evidence; (2) the prosecution made numerous improper remarks in closing argument, thereby depriving him of a fair trial; and (3) the prosecution failed to prove him guilty of armed robbery beyond a reasonable doubt.

We reverse and remand.

## BACKGROUND

At approximately 7 p.m. on December 17, 1990, Verlean Brown was walking east on 67th Street. She carried her purse and a bag containing two pillows which she had just purchased. Her purse contained her identification, an uncashed check, a coin purse and $11.

When she reached the corner of 67th and Michigan, a man approached her from the right and snatched the bag of pillows from her hand. She testified that she started to resist him until she looked down and observed that he was holding a knife. When the man told her to drop her purse, she did so and then stepped back from him. The man stooped down, picked up her purse, and ran back the way he came. Ms. Brown testified that the area was lighted by streetlights and she looked directly into the robber's face.

As the man ran away, Ms. Brown ran to the telephone booth located at 67th and State and dialed 911. She told the police that the assailant was wearing a beige coat, a beige sweater cap, and dark pants. She then waited on the corner until the police arrived.

Upon entering the police car, she repeated her description of the assailant, adding that he was about 5 feet 6 inches and dark complected. The police and Ms. Brown then drove to the location where a suspect had been captured. As they approached the scene, Ms. Brown observed two officers escorting a man to a police car, and she identified that man as the robber. She recognized the man by his face and his clothing. Ms. Brown testified that she was about 25 feet away from the man when she recognized him and the area was lit up by police cars and streetlights.

Next, she was taken to the police station where she identified her coin purse, money and pillows. The police also showed her a screwdriver which they had recovered from the robber. At trial, Ms. Brown identified Fields as the man who robbed her.

Officer Mark Yelverton testified that on December 17, 1990,

around 7 p.m., he and his partner monitored a flash message which indicated that a robbery had just occurred. In response, they drove to the area of 67th and State, where they encountered Ms. Brown. Ms. Brown gave them a brief description of the offender and got into the police vehicle. Yelverton's partner sent a flash message containing the description of the offender over the police radio, and they began touring the area. As they drove east on 67th Street, the officers received a second flash message from tactical officers who were in pursuit of a possible suspect. The officers then proceeded to the Quam-Nickels Factory, about three blocks east of the location where they picked up Ms. Brown.

Yelverton testified that the area was lighted by streetlights, headlights and the flashing lights of the police vehicles. As they entered the factory parking lot, Yelverton observed two officers escorting a man down the railroad embankment toward the police vehicles in front of them. When the figures were about 20 to 30 feet away, Ms. Brown began pounding on the rear partition of the police vehicle and saying "that's the guy, that's the guy." When Yelverton asked her if she was certain, she responded affirmatively, "that's the guy who robbed me." Yelverton testified that Fields was the man who was escorted down the embankment and identified by Ms. Brown.

After Ms. Brown identified Fields at the scene, the two police vehicles—one with the tactical officers and Fields, and the other with Yelverton, his partner and Ms. Brown—proceeded to the police station for processing. When they arrived, Ms. Brown signed a complaint and identified her pillows, coin purse, and money. The police also showed her a screwdriver which they considered a possible weapon. On cross-examination, Yelverton acknowledged that in the police report which he prepared after Fields was apprehended, he stated that Ms. Brown had described the offender as wearing a dark brown hat, tan jacket, and dark brown pants.

Officer Eddy Garrett testified that on December 17, 1990, at approximately 7 p.m., he received a flash message over the radio indicating that a robbery took place in the area of 67th and Michigan. The offender was described as a black male wearing a brown hat, beige or brown jacket and dark pants, possibly carrying two pillows. As Garrett and his partner searched the area of the incident, they came upon a suspect who matched the description at approximately the 300 block east on 67th Street behind the Quam-Nickels Factory. They approached him, exited their car and called out "police." The suspect dropped the bag of pillows and began to run up a railroad embankment and onto the train tracks where he grabbed a rung from the ladder of a moving train. The officers ran up the

embankment after him and pulled him from the moving train. After the officers and the offender tumbled down the hill, the officers picked the subject up and escorted him down the embankment toward the squad cars; Garrett held one of his arms, and his partner held the other. As they approached the waiting squad cars, Yelverton, who was in the vehicle with the victim, called out "we have a positive identification." Garrett testified that Fields was the suspect who was captured and identified by Ms. Brown.

At the scene, the officers conducted a pat-down frisk during which they recovered a screwdriver from one of Field's pockets. Fields was placed under arrest and taken to the station. At the station the officers conducted a search of Field's person and recovered a coin purse and $11.

Following the testimony of Garrett, the State rested. At this point, defense counsel objected to the screwdriver being admitted into evidence. The trial court sustained the objection, noting that the State had not connected the screwdriver with the crime.

Next, Fields took the stand. He testified that prior to his arrest on the evening of December 17, 1990, he had been visiting a cousin who lived at 64th and Normal. They had worked on the taillight of his cousin's car and then had a few drinks. While they were sitting on the trunk of the car drinking, Fields put his cousins's screwdriver in his back pocket and then forgot that it was there.

Around 6:45 p.m., Fields left his cousin's house and began walking to catch the bus. He walked south three blocks to 67th Street and then turned east on 67th Street. When he reached the factory parking lot, he saw a man coming down from the railroad tracks carrying a white bag. The man set the bag down by a dumpster and walked back up the embankment. Fields, who thought that he had been blessed with the man's "stash," went over to the dumpster and picked up the bag.

As Fields picked up the bag, an unmarked car came racing at him. He dropped the bag and ran. The car kept coming at him as if the driver intended to run him down. Fields eventually ran up the railroad embankment, reached unsuccessfully for a moving train, stumbled and fell. He was then grabbed by two policemen, handcuffed, and led down the embankment to a squad car. Fields stated that he never had the chance to look inside the bag and discover its contents.

Fields was then taken to the station where he was searched. He testified that he had in his possession $13.45 and various other personal belongings. The officers took his money, the screwdriver and his other belongings. Fields stated that he did not have a change purse on him. The first time he saw the change purse was when an

officer entered the interrogation room with it and asked him if it was his; Fields replied that it was not. Fields stated that he cooperated with the police and he denied any involvement in the robbery of Ms. Brown.

In rebuttal, the State called Officer Thomas Kelly. Kelly testified that he interviewed Fields at about 9 p.m. on December 17, 1990. Kelly stated that after he advised Fields of his constitutional rights, Fields related the following account of events to him. Fields had been walking eastbound on 67th Street towards King Drive, when he observed a black male running through an empty lot. The male dropped a large white bag and continued running towards some railroad tracks. Fields considered the plastic bag to be a freebie, so he went over and picked it up. Before Fields could look in the bag, he saw an unmarked squad car approach him, and he dropped the bag and began to run.

Kelly testified that when questioned about the screwdriver, Fields stated that he had used it to work on a friend's automobile earlier in the day. Kelly also testified that Fields stated that he had had the change purse for a long time and that it contained $11 or $12. On cross-examination, Kelly conceded that he did not mention Field's identification of the coin purse in his report. Kelly also conceded that he did not prepare a written statement for Fields to review and sign; nor did Kelly record any statement by Fields.

During deliberation, the jury requested to see the screwdriver that was involved in the case. After hearing argument, the court ruled that the screwdriver, though never admitted into evidence, should be taken to the jury. The jury found Fields guilty of armed robbery and the court sentenced him to 30 years' imprisonment. This appeal followed.

OPINION

I

Initially, Fields contends that the trial court erred in sending the screwdriver to the jury because it was never admitted into evidence. After the People rested, defense counsel objected to admission of the screwdriver and the trial court sustained the objection with the following comments:

"THE COURT: I think the objection is well taken. I think there could have been follow-up questions. For reasons of strategy that wasn't done in terms of asking the witness to describe [the knife] and what it looked like and her opportunity to observe it to lay a foundation to argue could it have been a screwdriver type of thing. That wasn't done.

So basically, what the record has here is her, and she said it at least three times between direct and cross-examination that it was a knife, and there was never any doubt in her mind that it was a knife and there was no inquiry into that. So now he is found shortly thereafter with a screwdriver.

[PROSECUTION]: Which is a dangerous weapon, which is what the indictment charges.

THE COURT: It only becomes a dangerous weapon if it is used by him with that intent, and she has not in any way put him in possession of it at the time he was making the threatening gestures."

Subsequently, during deliberation, the jury requested to view the screwdriver. After hearing argument, the court sent the screwdriver to the jury based upon the following rationale:

"The Court rules the jury has seen the screwdriver in open court, it was identified by several witnesses and discussed during testimony and in argument and I think it is a fair request based on testimony in matters that have transpired including argument subsequent to the time we originally discussed this matter that the jury should have that as part of their deliberations. At this time I order that the screwdriver be taken to the jury \*\*\* at their request."

■ It is a well-established rule that it is error to permit the jury to take with it into the jury room, during deliberations, any item which has not been admitted into evidence. (*People v. Holcomb* (1938), 370 Ill. 299, 300; *People v. Carr* (1977), 53 Ill. App. 3d 492, 497.) Moreover, we cannot say that the error was harmless in this case because the evidence presented at trial was insufficient to support the admission of the screwdriver; the State failed to establish a nexus between the screwdriver and the crime.

Physical evidence may be admitted provided there is evidence to connect the object found with the defendant and with the crime. (*People v. Miller* (1968), 40 Ill. 2d 154, 159; *People v. Magby* (1967), 37 Ill. 2d 197, 202.) In the instant case, the screwdriver was connected with Fields since it was found on his person when he was arrested. However, based upon the evidence presented at trial, the screwdriver was never connected with the crime. Ms. Brown testified unequivocally that the man who robbed her held a knife. She stated at least three times that the object she saw in the robber's hand was a knife, and she never expressed the slightest bit of doubt about what she saw. The State chose not to attempt to lay a foundation for the screwdriver by asking her if she had difficulty seeing the weapon or if it was possible that the object she saw could have been something other than a knife. Moreover, we note that the instant case is distin-

guishable from cases where the defendant was found to be in possession of a *per se* dangerous weapon, such as a gun or knife. (See, *e.g., People v. Jackson* (1956), 9 Ill. 2d 484; see also *People v. Dwyer* (1927), 324 Ill. 363 (gun, pistol and dirk-knife are *per se* deadly weapons).) A screwdriver only becomes dangerous when used in a dangerous manner, and the evidence did not indicate that the robber used a screwdriver for any purpose. Thus, under the facts presented, the evidence did not support the admission of the screwdriver. Because we find that reversible error was committed when the trial court sent the screwdriver to the jury, despite the fact that it was not admitted into evidence, Fields is entitled to a new trial.

## II

Fields next contends that the prosecution made numerous prejudicial remarks during closing argument which deprived him of a fair trial. Although we have already concluded that a new trial is warranted, we briefly address those allegations of error which we deem significant for the purpose of preventing recurrence upon retrial.

Fields first contends that the State made several references to his prior convictions which exceeded the bounds of proper argument. Fields directs our attention to the following excerpts from the record:

"Armed robbery is a violent crime. It is a violent crime committed by criminals usually against decent hard working folks. Ronnie Fields is a criminal.

* * *

He sits before you a convicted felon, and on 12-17-90 ladies and gentlemen, he was a convicted felon.

* * *

Ladies and gentlemen, he's got the most to lose because he's a convicted felon.

* * *

He's a convicted felon, ladies and gentlemen, he is in trouble and he knows it. *** We're confident that when you go back to the jury room to deliberate you will return a verdict that will tell Ronnie Fields that you will no longer tolerate armed robbers like him—."

■ If evidence of other crimes is admitted, the prosecutor may refer to or summarize such evidence in closing argument. (*People v. Musitief* (1990), 201 Ill. App. 3d 872, 879; *People v. Clark* (1989), 186 Ill. App. 3d 109, 114-15.) However, the prosecutor is not permitted to make statements in closing argument which are designed only to

inflame the jury. (*People v. Coleman* (1992), 223 Ill. App. 3d 975, *aff'd in part & rev'd in part* (1993), 155 Ill. 2d 507.) Here, evidence of Field's prior convictions for residential burglary and theft were published to the jury for the sole purpose of judging his credibility as a witness. The prosecutor's repeated references to Fields as a convicted felon went beyond fair comment upon the evidence. No legitimate purpose could be served by dwelling on the fact that Fields was a convicted felon; the evidence served only to inflame the jury's passions and encourage a search for the truth based upon Field's prior convictions rather than solely on the facts of the case and the credibility of the witnesses. See *Clark*, 186 Ill. App. 3d at 114-15; *People v. Pruitt* (1988), 165 Ill. App. 3d 947, 953.

Fields next contends that the State improperly bolstered its own witnesses, while simultaneously mocking the defense. Fields cites to the following passages from the record in support of his contention:

"Yet the defense \*\*\* wants you to believe that Ronnie Fields is now a victim of a huge conspiracy concocted by the police, Verlean Brown and the State's Attorney's office. He wants you to believe that Verlean Brown is a liar, that the police are liars, thieves and framers and that even myself and my partner are somehow involved in this conspiracy.

\* \* \*

The police? Are they going to come in here and risk perjury, a perjury charge for Ronnie Fields? They're not going to do that for him.

\* \* \*

And the most important evidence of all, ladies and gentlemen, \*\*\* Officer Garrett told you where this was recovered from, from the defendant's pocket, ladies and gentlemen. He didn't perjure himself here too and lie to you. If he wanted to lie why not say we saw the victim's purse on him also.

\* \* \*

Wouldn't you think that if the defense or the police were part of this big frame-up, [they'd] do a better job for Christ sake. Wouldn't they put a little bit more beef into it. Wouldn't they at least say the defendant, yeah, we recovered the knife, this is the knife, this is the purse she had on her shoulder, the defendant confessed to everything. Of course they would have if it was a frame-up. But the police came in here and told you exactly what happened, the truth. That is what happened, that is what they told you. It is preposterous to think that.

\* \* \*

And ask yourselves this, ladies and gentlemen, why would the police come here and lie to you about their testimony. Would they risk their jobs, their careers, their pensions? Would they risk their reputation as police officers to lie for Ronnie Fields? Of course not. They are under oath, they were doing their duty, and they want to tell you exactly what happened, ladies and gentlemen."

■ The prosecutor's remarks were highly improper. It is well established that a prosecutor may not argue that a witness is more credible because of his status as a police officer. (*Clark*, 186 Ill. App. 3d at 114-15.) Similarly, it is improper for a prosecutor to express personal beliefs regarding the credibility of witnesses or to invoke the integrity of the State's Attorney's office. (See *People v. Wilson* (1990), 199 Ill. App. 3d 792, 795-96.) Finally, there is nothing in the record to indicate that Fields claimed that he was the victim of a conspiracy and frame-up; he presented a defense of mistaken identity. The prosecutor's repeated remarks regarding a conspiracy were improper. See *People v. Parker* (1979), 72 Ill. App. 3d 679, 681.

### III

Finally, Fields contends that the prosecution failed to prove him guilty of armed robbery beyond a reasonable doubt.

A reviewing court will not set aside a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (*Collins*, 106 Ill. 2d at 261.) Nor may the reviewing court substitute its judgment for the trier of fact on questions involving the weight of the evidence or credibility of witnesses. (*People v. Young*, 128 Ill. 2d 1, 51.) Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosection, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see *Collins*, 106 Ill. 2d at 261.

A person commits armed robbery when he takes property from the person or presence of another by the use of force or by threatening the use of force while armed with a dangerous weapon. (720 ILCS 5/18—2 (West 1992); *People v. Fitzgerald* (1988), 171 Ill. App. 3d 218, 223.) Fields argues that the State failed to prove beyond a reasonable doubt that (1) he was the man who robbed Ms. Brown, and (2) he possessed a dangerous weapon.

When assessing the reliability of an identification, the relevant factors to consider are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *People v. Holmes* (1990), 141 Ill. 2d 204, 239-40.

The evidence indicates that Ms. Brown had ample opportunity to view Fields and her degree of attention was certainly adequate. She testified that the scene of the crime was illuminated by streetlights. She stated that Fields "was right up on [her]," and she "looked him right in his face, in his eyes." Next, Ms. Brown's prior description was accurate. She stated that the offender was wearing a beige coat, a beige sweater cap, and dark pants; Officer Garrett testified that Fields was wearing a brown or beige coat, a brown cloth hat, and dark brown pants. Ms. Brown was certain about her identification of Fields at the confrontation in the factory parking lot. As Officer Yelverton testified, once Fields was brought within 20 to 30 feet of their vehicle, Ms. Brown began pounding on the rear partition of the police vehicle and saying "that's the guy, that's the guy." When Yelverton asked her if she was certain, she responded affirmatively, "that's the guy who robbed me." Finally, mere minutes lapsed between the crime and the confrontation.

Fields focuses primarily on factor three: the accuracy of Ms. Brown's prior description. He asserts that the inconsistencies in Ms. Brown's description of her assailant render her identification unreliable.

Ms. Brown testified that she told the police that the man who robbed her had facial hair, was about 5 feet 6 inches tall, dark complected and wore a beige coat, a beige sweater cap, and dark pants. Fields points out that Yelverton testified that he did not recall Ms. Brown describing any facial hair to him. Also Yelverton did not testify that he was given a height or complexion description by Brown. His police report reflected that he was told that the offender wore a dark brown hat, tan jacket and dark brown pants. Finally, Garrett testified that he received a description of a black male offender wearing a beige or brown jacket, a brown hat, and dark pants. Fields also points out that during the preliminary hearing Ms. Brown testified that the offender wore a baseball-type hat, though she did not recall giving that answer.

■ Generally, discrepancies regarding physical characteristics are not fatal, but simply affect the weight to be given the identification testimony. (*Holmes*, 141 Ill. 2d at 240.) Furthermore, variances be-

tween a witness' trial testimony and pretrial statements raise questions of credibility which the trier of fact must assess in making a determination of guilt. (*Holmes*, 141 Ill. 2d at 240-41.) We conclude that the existence of minor inconsistencies in Ms. Brown's description of Fields does not create a reasonable doubt of his guilt.

Fields next asserts that the State failed to prove beyond a reasonable doubt that he was armed with a dangerous weapon. He argues that despite the fact that the police arrested him shortly after the offense occurred, he was not found to possess a knife or any other dangerous weapon. Moreover, he argues that the screwdriver found on his person cannot be considered a dangerous weapon for purposes of an armed robbery conviction. Fields claims that other than the testimony of the complainant there was no evidence to indicate Fields was armed with a dangerous weapon at the time of the robbery.

■ As we previously determined, the screwdriver was improperly admitted into evidence and, therefore, could not support a conviction for armed robbery. However, there was other competent evidence presented at trial which would have been sufficient to support a finding that Fields was armed with a dangerous weapon. Ms. Brown testified that she saw Fields holding a knife at the time he robbed her. Contrary to Fields' assertion, the fact that no knife was recovered was not fatal to the State's case; Ms. Brown's testimony alone was sufficient to support a conviction for armed robbery. See *People v. Holloway* (1991), 225 Ill. App. 3d 47; *Fitzgerald*, 171 Ill. App. 3d 218; *People v. Chapman* (1981), 94 Ill. App. 3d 602.

Although we conclude that the evidence would have been sufficient to support a conviction beyond a reasonable doubt, we cannot conclude that the jury would have found Fields guilty of armed robbery absent the improper submission of the screwdriver to the jury in this case. Accordingly, we reverse and remand for a new trial.

For the foregoing reasons, the judgment of the trial court is reversed and remanded for a new trial.

Reversed and remanded.

MURRAY, P.J., and GORDON, J., concur.