THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN HAMILTON, Defendant-Appellant.

First District (3rd Division)   No. 1—97—3926

Opinion filed February 20, 2002.

SOUTH, J., specially concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Arleen Anderson, and Julia Egan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Kevin Hamilton literally talked himself into the penitentiary. His conviction by a jury of the first degree murder of Curtis Jackson was based almost entirely on his oral and written statements. He was sentenced to 41 years in the Department of Corrections.

On appeal, the defendant contends: (1) his statement should have been suppressed; (2) too much gang life evidence was admitted; (3) his prior conviction for possession of a controlled substance should not have been admitted to impeach his credibility; (4) he was denied a fair trial when the State made improper remarks during closing argument; and (5) his sentence was based on an improper factor and was excessive. We affirm the defendant's conviction and sentence.

## FACTS

Curtis Jackson was shot seven times and killed as he talked to someone in a small white car at 41st and Indiana Streets in Chicago shortly after midnight on July 9, 1995. Very little progress in the police investigation of the death was made until February 13, 1996, when Officer David Case arrested the defendant for unlawful use of a weapon.

Case testified that while outside the car defendant told him he did not want to go to jail. Once inside the car, defendant again said he did not want to go to jail and asked "would it help if he knew about a murder."

Case showed no immediate interest in the defendant's inquiry. He took the defendant to the ninth district and processed him for the unlawful use of a weapon. Again, defendant said he had information about a murder. He gave Case the name of the victim, Curtis Jackson, and he gave him the location in Area 1 where the murder happened. Case began to take the defendant seriously. He notified detectives from Area 1 that the defendant was in custody and had information about the murder of Curtis Jackson.

Two Area 1 detectives, Cegielski and Crescenzo, went to the ninth district on the morning of February 14. They read the defendant his rights. The defendant described his role in the shooting of Jackson and told them where they could find the shooter, Shaboo. They arrested Shaboo and brought him to the station. The defendant later identified Shaboo as the shooter.

Assistant State's Attorney (ASA) Elaine Wisnosky arrived at the police station in the late morning of February 14. She had two unrecorded conversations with the defendant, and then, at about 6:46 to 7:10 that evening, the defendant gave a court-reported statement. She reviewed the completed statement with the defendant and allowed him to make corrections to it. She read it to the jury.

The confession sets out the defendant's role in the murder and the reason for it in exhaustive detail. At trial, the defendant did not deny he made the statement. Nor did he say he made it involuntarily or that he was treated badly. He admitted he told Officer Case he did not want to go to jail and that he wanted to make a deal. But at all times, said the defendant, he was merely repeating what he had been told by the police officers and by people he knew, including Shaboo. He made the untrue statements, he said, because the officers led him to believe the unlawful use of a weapon charge would be dropped and he would be allowed to go home. In fact, he said, he was shocked when he realized he was being charged with first degree murder.

Each police witness denied feeding the defendant any incriminating information and denied promising him he could go home once the statement was made. Cegielski's testimony about what the defendant told him mirrored the defendant's court-reported statement to ASA Wisnosky.

Because the contents of the defendant's confession play the leading role in this appeal, we summarize it in some detail.

Kevin Hamilton was 23 years old at the time of the statement; he

attended high school for one year and then got his GED. In July of 1995, when the shooting occurred, he was living at 4445 South Evans in apartment 1610. He remembered the day of July 8, 1995, because that was the day that Randy, a fellow Blackstone, was killed. The defendant was a member of the Blackstone street gang and had been for seven years. The Blackstone's territory is the building at 4445 South Evans. He held a position within the gang as a "motif." He had been a motif for seven months and prior to that he was a "soldier." A motif's role, according to defendant, is to secure the members of the gang with higher rank. The hierarchy of the gang is as follows: generals, motifs, key soldiers, and soldiers. He was a soldier before he was a motif. Randy was an emir in the gang, an enforcer, "hit man of the nation," a higher rank than the defendant. Ranks within the gangs are called different names in different areas of the city. The ranks at 4445 South Evans were angels, emirs, mutoddys, and magalises.

When Randy was killed on July 8, 1995, the Blackstones called a meeting. Defendant attended the meeting because it was mandatory. The meeting took place at 4445 South Evans. Defendant then gave names of specific people who attended the meeting. At the meeting, the gang discussed the killing of Randy by the Mafia Insane Vice Lords, a rival gang. The Mafia Insane Vice Lords are the "opposition" of the Blackstones on 4445 South Evans. At the meeting, they gave prayer for Randy's passing and talked about how it was war between 4445 South Evans and the 4120 building, between the Blackstones and the Mafia Insane Vice Lords. By the word "war," the defendant said he meant retaliation, "Like eye for eye. They kill one of us; so we kill one of them." He said that they decided to retaliate because Randy was the emir and he had rank.

After the meeting, he went downstairs to the fifth floor of 4445 South Evans to see his friend Saladine. They drank, smoked, and watched a movie. He then left there and went upstairs to "Shaboo's" apartment to play cards and drink. At the time he had known Shaboo for a few weeks. Shaboo has several aliases, including Lee Joyson and Shelby Mitchell. Shaboo was also at the meeting and he stated that somebody had to pay for the death of Randy, "either hell or jail," but he was going to make it right for his brother. When he was up in Shaboo's apartment, they decided to walk up to the Bootlegger to get something to drink.

When defendant and Shaboo exited the front door and started to walk towards 43rd and Evans, where the Bootlegger lady was, a white car pulled up in front of 4445 South Evans. There was a heavy-set black male driving the car and no one else was inside the car. He didn't remember the make or year of the car, but believed it was "like

an Escort, Tempo, or something like that, a small car." The car had four doors. Shaboo walked over to the guy in the car and started to have a conversation; defendant stayed back on the sidewalk. After Shaboo finished talking to the man in the car, he opened the door, and before he got in on the passenger front side, he said "come on" to defendant. Defendant walked over to the driver-side door and got in the backseat.

They then drove over to the area where Randy had been shot in Mafia Insane Vice Lord territory. They drove around there with the purpose of retaliation against the Mafia Insane Vice Lords. While they were in the car, Shaboo bent down and was fiddling with his leg or shoe or something. When he came back up, he had a chrome 9-millimeter Smith and Wesson. He passed it to defendant in the backseat. Defendant asked Shaboo what he wanted him to do with it, and he said "just hold it." Defendant took it and held it while they kept driving around.

They saw the victim, Curtis Jackson, at the corner of 41st and Indiana. He was in front of the liquor store on that corner. Upon seeing the victim, Shaboo said, "there go one of them bitches there." Defendant stated that he understood that to mean that Curtis Jackson was a Mafia Insane Vice Lord. The man driving the car stopped across the street from the liquor store and Shaboo signaled for Curtis Jackson to come over to the car. Mr. Jackson walked over to the car. He was wearing a tee shirt, jeans, and a red cap turned to the left. A cap turned to the left represents People. Both the Mafia Insane Vice Lords and Blackstones are members of People. Even though these two gangs were within People, it was not unusual for them to be at war. The defendant did not think that Mr. Jackson was a gang member; he thought that he was a bum or something like that.

When Mr. Jackson walked up to the car, Shaboo asked him to buy beer for them. Jackson said he would, and the driver gave him some money. Mr. Jackson then went back across the street and inside the liquor store. Once Mr. Jackson walked away from the car, Shaboo said to defendant, "Give me that," referring to the gun. The defendant then gave Shaboo the gun. The defendant knew, at that point, Shaboo was going to shoot Mr. Jackson because he thought he was a Mafia Insane Vice Lord.

Mr. Jackson then exited the store and walked over to the car. He started to walk towards the driver's side door, and Shaboo said to him, "No, hold it, bring it over here to the passenger side." Mr. Jackson walked to the passenger side and handed Shaboo the beer. Shaboo said "thank you" and then shot him six or seven times. Mr. Jackson was standing outside of the car and the bullets hit him in the chest and

neck. Mr. Jackson "folded up like he was trying to protect himself," and then fell to the ground.

The driver sped off down 41st street and back to 4445 South Evans. Defendant got out of the car, flashed the Blackstone's gang sign at the driver, referred to as "extending five," and then Shaboo said something to the driver and flashed the gang sign as well. Defendant and Shaboo walked to the back of the building where there was a hole in the gate. The hole in the gate was used by the gang members to get guns in and out of the building. Shaboo put the gun through the hole and someone was there to retrieve it. They then went around to the front of the building and up to Shaboo's apartment. When they got into the apartment, there were other people there and Shaboo said to them, "We just did this dude right...you should have seen Butterfly's face...when he was shot." They then drank some beer and played cards for several hours.

In addition to his testimony about why he made the statement, defendant denied playing any part in the shooting. He admitted being a member of the gang, but denied he was a motif at the time of the shooting.

In addition to the defendant, the defense called an alibi witness, Patricia Turnercobb, who said the defendant was at her home, at her daughter's birthday party, on the night of the shooting. Also present, she said, were her daughters, son, grandchildren, and goddaughter. None of the others testified.

The jury returned a guilty verdict. The defendant was sentenced to a term of 41 years. This appeal followed.

## DECISION

### Admissibility of the Confession

This case is before us for the second time. On September 9, 1999, we issued a Rule 23 order (166 Ill. 2d R. 23) reversing the trial court's denial of the defendant's motion to quash arrest and suppress evidence. We held the defendant's initial arrest by Officer Case was unlawful. We remanded the case to the trial court with instructions to conduct an attenuation hearing to determine whether there was "sufficient evidence to purge defendant's confession from the taint of the unlawful arrest." *People v. Hamilton*, No. 1—97—3926 (1999) (unpublished order per Supreme Court Rule 23).

On remand, the trial court conducted the hearing. Officer Case testified to defendant's willingness to share information about the Jackson murder. Case described his call to Area 1 detectives and his own exit from the ninth district and any further contact with the defendant.

■ The trial court recognized, and we agree, that there is ample evidence the defendant willingly and for his own purposes made his statements to ASA Wisnosky and the Area 1 detectives. They had nothing to do with the defendant's original arrest and unlawful detention. Case knew nothing about the Jackson murder when he arrested the defendant. It was uncontested that all questioners gave defendant his *Miranda* rights before statements were made.

We believe the trial court correctly held the prosecution proved by clear and convincing evidence the defendant's various statements were acts of free will, "unaffected by the initial illegality." *Brown v. Illinois*, 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261 (1975). That is, intervening events, centering on his desire to win favorable treatment from the State on an unrelated charge, persuade us the defendant's statements were not the product of the unlawful arrest. See *People v. Gabbard*, 78 Ill. 2d 88, 398 N.E.2d 574 (1979). Admitting the defendant's statements was not error.

### The Gang Life Evidence

Officer David Jarmusz, a gang crimes specialist assigned to the Chicago police department's organized crime division, was allowed to testify as an expert witness on gang life, structure, and behavior. He told the jury how the 135 street gangs in the Chicago area are divided and which areas they control. He offered details of gang lingo, symbols, tattoos, and graffiti the gang use to symbolize their allegiance and to establish their identity. He explained gang hierarchy, which ranges from soldiers, key soldiers, emirs, motifs, ambassadors, generals, princes, main 21's, and chief malik—at that time, Jeff Fort. He discussed the turf wars that arise from time to time because of disputes arising out of the "sale and distribution of narcotics."

Officer Jarmusz was shown a photograph of the defendant. The photo showed tattoos on the defendant's left chest and right arm. The officer identified them as gang tattoos commonly used by Blackstones—the gang in which defendant admitted membership. Officer Jarmusz's testimony paralleled the defendant's court-reported statements about the ranks and duties of Blackstones and the hand signs used by gang members.

The defendant agrees, as he must, that some evidence of gang behavior was relevant. After all, it was the defendant's confession that established how the inner workings of the Blackstones led to the death of Curtis Jackson. Defendant's rank as a motif and the gang's desire to avenge Randy's death established the motive and the plan for deadly revenge.

Still, says the defendant, there was too much detail about gang life

in Jarmusz's testimony and in the confession heard by the jury. He contends details about graffiti, tattoos, and drug sales had nothing to do with the defendant's motives and for that reason, especially when taken with the State's final argument comments about gang structure and behavior, reversible error was committed. We do not agree.

We recognize there may be strong prejudice against street gangs in the Chicago area. *People v. Smith*, 141 Ill. 2d 40, 58, 565 N.E.2d 900 (1990). At the same time, evidence of gang membership and gang rivalries becomes relevant when it establishes the reasons for deadly gang behavior. See *People v. Colon*, 162 Ill. 2d 23, 30, 642 N.E.2d 118 (1994). Relevant gang evidence is not excluded simply because it may have a tendency to prejudice the accused. *People v. Patterson*, 154 Ill. 2d 414, 458, 610 N.E.2d 16 (1992).

In *Patterson*, expert testimony, using photographs, about gang membership and allegiances was held relevant to explain the "defendant's expressed motivation behind the otherwise inexplicable murders." *People v. Patterson*, 154 Ill. 2d at 459. There, as here, the motive for the crime—pursuit of gang goals—was not theoretical, but was admitted by the defendant. We have said on several occasions gang evidence is admissible to explain what otherwise would appear to be a random and inexplicable attack. *People v. Resendez*, 273 Ill. App. 3d 751, 758, 652 N.E.2d 1357 (1995); *People v. Ayala*, 208 Ill. App. 3d 586, 594, 567 N.E.2d 450 (1990).

■ We do agree with the defendant that the torrent of detail concerning gang life, especially the prevalence of gang tattoos and the competitive narcotics sale enterprises, was unnecessary piling on. The trial court should have done some editing. But the decision to admit gang evidence is not to be overturned on appeal "unless a clear abuse of discretion is shown." *People v. Colon*, 162 Ill. 2d at 30. Also see *People v. Gonzalez*, 142 Ill. 2d 481, 489-90, 568 N.E.2d 864 (1991).

The defendant's case for reversible error relies on *People v. Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995). There, admission of excessive detail about gang life other than organizational structure was held to be reversible error. But in *Mason* facts about gang rivalries, presentment, graffiti, tattoos, and drug sales were not relevant to motive because the defendant and victim were members of the same gang. That is not the case here. We hold, despite the expert's testimonial overkill, there was no reversible error.

## Use of the Defendant's Prior Conviction

■ The trial court denied the defendant's motion to bar the State from using his prior conviction for possession of a controlled substance for impeachment purposes. Relying on that ruling, defense counsel elicited the fact of conviction on direct examination.

The State does not contend the defendant forfeited the proposed error by eliciting the conviction on direct examination. See *Ohler v. United States*, 529 U.S. 753, 146 L. Ed. 2d 826, 120 S. Ct. 1851 (2000). It does say the trial court properly weighed the probative value of the conviction against the danger of unfair prejudice and thus did not abuse its discretion. The court said:

> "I find that the prejudicial value, prejudicial aspect of that conviction does not outweigh probative value. Possession controlled substance is [*sic*] a relatively minor felony, and is not naturally prejudicial to the charge of first degree murder. So the motion is denied ***."

While the probative value of a controlled substance conviction is far from overwhelming, it is apparent the trial court did perform a weighing test of sorts, something it is charged with doing. *People v. Bramlett*, 276 Ill. App. 3d 201, 207, 658 N.E.2d 510 (1995). We find enough probative value and enough of a weighing test to conclude the trial court did not abuse its discretion when it allowed the prior conviction. See *People v. Williams*, 173 Ill. 2d 48, 670 N.E.2d 638 (1996).

### Whether There Was Proof Beyond a Reasonable Doubt

■ Defendant's court-reported confession hangs over his failure-of-proof claim like a dark cloud. It tells a detailed and persuasive story of mindless gang revenge. Much of it meshes with the other evidence—a firearms examiner finding 9-millimeter shell casings at the scene, a witness seeing Jackson talk to one or more persons in a white car at 41st and Indiana just before the shooting, and the recent demise of fellow gang member, Randy.

Defendant's confession creates legal accountability for the murder. It shows him aiding and abetting Shaboo in the planning and commission of the offense. He said he held the gun and he said he handed it to Shaboo just before the killing. That is legal accountability, under the cases and the statute. See *People v. Hill*, 53 Ill. App. 3d 280, 368 N.E.2d 714 (1977); 720 ILCS 5/5—2 (West 1994).

In order to return a not-guilty verdict, the jury would have had to give credence to the defendant's claim he merely was repeating what he had been told and he confessed because he believed the police when they said the weapons charge would be dropped and he would be sent home. The jury's guilty verdict obviously relied on the confession. We will not second-guess determinations of witness credibility and testimonial weight reached by the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226, 568 N.E.2d 837 (1991). We conclude there was sufficient evidence to support the jury's verdict.

### The State's Closing Arguments

■ The defense contends several closing argument remarks by the

prosecution constituted reversible error. We have examined the State's comments and find they do not, singly or together, rise to the level of reversible error. The bounds of permissible comment may have been exceeded on occasion, but we recognize "the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different." *People v. Byron*, 164 Ill. 2d 279, 295, 647 N.E.2d 946 (1995).

We are especially troubled by two of the State's comments:

> "You don't have to buy that. That's a joke. It's an insult to your intelligence. Why don't the detectives just throw their badges in the toilet? Why don't the State's Attorneys just throw their law degrees in the toilet too?"

And, "this is a defense of desperation. They [defense attorneys] know this puts him in jail. They've got to think of something."

We have examined the defense final argument and we find no support for the State's claim that its comments were invited.

We continue to be puzzled by the State's willingness to risk the integrity of convictions by making comments we repeatedly have held cross the line of propriety. The prosecution cannot use its official position to bolster witness credibility. See *People v. Fields*, 258 Ill. App. 3d 912, 920-21, 631 N.E.2d 303 (1994); *People v. Montgomery*, 254 Ill. App. 3d 782, 793-96, 626 N.E.2d 1254 (1993). Nor can it accuse defense counsel of fabricating a defense. *People v. Emerson*, 97 Ill. 2d 487, 497, 455 N.E.2d 41 (1983).

Disapproval of argument aside, we conclude the defendant was not deprived of a fair trial.

### The 41-year Prison Sentence

■ We find nothing in the record that supports the defendant's claim that the trial judge improperly considered the victim's age, 39, when pronouncing sentence. The court simply was describing the victim—"a poor unfortunate resident from the south side, an older person."

Nor can we say the length of the sentence was an abuse of the trial court's sentencing discretion. It was well within the statutory range of 20 to 60 years (see 730 ILCS 5/5—8—1(a)(1)(a) (West 1994)), and "proportionate to the nature of the offense and the possibilities of rehabilitation." *People v. D'Arezzo*, 229 Ill. App. 3d 428, 434, 593 N.E.2d 1076 (1992). We find no error in the sentencing.

### CONCLUSION

While this was not a perfect trial, as we have noted above, we

believe the defendant received a fair trial. For that reason we affirm the defendant's conviction and sentence.

AFFIRMED.

HOFFMAN, P.J., concurs.

JUSTICE SOUTH, specially concurring in part and dissenting in part:

While I do concur with the majority that the trial court did not err in admitting defendant's statements, I must respectfully dissent with that portion of the opinion which holds that the admission of the gang life evidence did not deprive defendant of a fair trial.

There is no question that motive was an issue in this case, and that element was firmly established by the admission of defendant's statement that the shooting was done in retaliation for the earlier homicide of a fellow gang member. However, the gang life testimony of Officer Jarmusz far exceeded that quantum of evidence which was necessary to establish motive or corroborate certain portions of the statement. What may have started out as corroborative testimony burgeoned into an exposition on the pervasiveness and evils of street gangs in Chicago, the only conceivable purpose of which was to prejudice defendant in the eyes of the jurors. Even the majority acknowledges that the "torrent of detail concerning gang life" was "testimonial overkill." 328 Ill. App. 3d at 202.

The central issue was whether defendant was present at the scene of the crime and, therefore, accountable for the victim's murder. There was no physical evidence or eyewitness testimony linking defendant to the crime scene. In fact, there was some discrepancy between defendant's statement that the victim was shot at close range as he was standing next to the car and the medical examiner's testimony that there was no evidence of close-range firing. The only evidence the State presented linking defendant to the crime scene was his confession, which he challenged through his testimony that he was not present at the scene of the murder and that his statements to the police were based solely upon what was told to him by others who were actually there, and that he was simply telling the police what they wanted to hear in an effort to "deal" his way out of prison. Whether or not this court finds his testimony credible is irrelevant, for it is not our job as a court of review to reweigh the evidence and determine matters of credibility.

In this case, the fairness of defendant's trial was severely compromised by the introduction of what I believe to be highly irrele-

vant, inflammatory and excessive gang testimony. The admission of this evidence brings into serious question whether the jury fairly considered defendant's alibi evidence through the testimony of Patricia Turnercobb and defendant's testimony regarding the circumstances surrounding his statements. I find it highly unlikely that the jury could have ignored this "torrent" of "overkill" when evaluating the defense.

Officer Jarmusz had absolutely no knowledge about this case, defendant or the circumstances surrounding the arrest and was called solely for his expertise on street gangs. Rather than establish motive, he simply gave the jury a crash course on Chicago's street gangs. Furthermore, his testimony that feuds and wars between gangs within the People erupt from time to time due to turf control problems arising out of the "sale and distribution of narcotics" implied that defendant was dealing in drugs, an implication not supported by the record. Not only was the probative value of that evidence far outweighed by its prejudicial impact, it permitted the jury to draw insupportable inferences of other crimes.

The majority distinguishes *Mason* based upon the fact that the defendant and the victim in that case were members of the same gang, whereas in the instant case the defendant and victim were members of opposing gangs. I find that to be a distinction without a difference. What *Mason* held was that while the organizational structure of the Gangster Disciples was relevant to the State's case in order to demonstrate defendant's possible motive for shooting the victim, the facts about gang rivalries, presentment, graffiti, tattoos and drug sales clearly did not go to motive. *Mason*, 274 Ill. App. 3d at 722. Similarly, in the instant case, while the organizational structure of the Blackstones, the Mafia Insane Vice Lords and their umbrella organization, the People, might have been relevant to demonstrate defendant's motive for participating in the murder of a suspected member of a gang within the People organization, the facts about graffiti, tattoos, logos, hand signals, clothing and drug sales clearly did not prove or establish motive.

While the majority does not use the phrase "harmless error," I assume that is what is meant when it finds that in spite of these errors defendant received a fair trial. However, since the evidence in this case was far from overwhelming and rested solely upon defendant's *challenged* statements, harmless error is not the escape hatch we should utilize in placing our imprimatur on what I deem to be an unfair trial.

For these reasons, I would reverse and remand the cause for a new trial.