2019 IL App (1st) 161980-U

No. 1-16-1980

Order filed December 31, 2019

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 9015 |
| | ) | |
| ARTURO SANTOYO, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*: Affirmed. Evidence was sufficient to prove beyond reasonable doubt that defendant did not act in self-defense. Trial court did not abuse its discretion in admitting into evidence defendant's letters tending to show his association with street gang rival to victim's former gang. Defendant's sentence for aggravated battery with firearm was not excessive, as it fell significantly below statutory maximum.

¶ 2   Following a bench trial, defendant Arturo Santoyo was found guilty of aggravated battery

with a firearm and aggravated discharge of a firearm based on an incident in which he shot

Anthony Sauceda (Anthony) in a Walmart parking lot while Anthony was with his fiancée (now wife) Kali Sauceda (Kali) and their infant son, Anthony, Jr.

¶ 3     The trial court merged the counts and sentenced defendant to 16 years in prison for aggravated battery with a firearm. Defendant now appeals, arguing that (1) the evidence was insufficient to prove that he did not act in self-defense, (2) he was denied a fair trial by the admission of gang-related statements in letters he wrote while incarcerated, and (3) his sentence was excessive in light of his young age, employment history, and lack of a criminal record. We affirm.

¶ 4     Defendant was charged by indictment with the attempt murder of Anthony, aggravated battery with a firearm of Anthony, and aggravated discharge of a firearm in the direction of Anthony, Kali, and Anthony, Jr.

¶ 5     At trial in March 2016, Anthony testified that he had recently been released on parole after serving more than 15 years in prison for a gang-related murder and an armed robbery. He was a former member of the La Raza street gang and maintained friendships with some current members, but he did not "gang bang with them" anymore.

¶ 6     On the afternoon of May 11, 2015, Anthony, Kali, and Anthony Jr. (the Saucedas) went grocery shopping at a Walmart located in a shopping center near 47th Street and Loomis Boulevard. As they left the store, Anthony noticed a man in a white truck "looking at [him]" and "stalking [him]." Anthony did not know the man at the time but identified him in court as defendant. Anthony testified that he "might have said what the F you looking at" to defendant, but did not argue with him any further.

¶ 7     The Saucedas walked to their vehicle, a black Pontiac Grand Prix. Anthony put his son in the backseat and got in the driver's seat. Kali sat in the front passenger's seat. Anthony reversed his vehicle out of the parking space, but could not immediately drive forward because there was another vehicle in front of him. As Anthony waited for that vehicle to move, defendant pulled up next to him on the left. Anthony testified that he "might have flicked [defendant] off," "maybe threw a gang sign at him," and "might have" mentioned La Raza. However, he denied threatening defendant. Defendant responded by firing a gunshot that shattered Anthony's window and struck him in the left shoulder.

¶ 8     Defendant fled, and Anthony drove approximately two blocks before stopping in an alley. An undercover police officer who had followed him from the Walmart parking lot pulled in behind him. Anthony told the officer that he had been shot, and the officer called an ambulance. On May 12, 2015, Anthony spoke with detectives at the hospital and identified defendant as the shooter in a photo array.

¶ 9     On cross-examination, Anthony explained that defendant initially caught his attention because defendant "either flicked [him] off or he threw up a gang sign." Defendant did not say anything to Anthony at that time. Anthony flashed a gang sign back at defendant because defendant was "in [his] neighborhood." He "probably" mentioned something about La Raza, but did not have a firearm.

¶ 10    Anthony acknowledged that he did not initially cooperate with the police investigation because he was on parole and "did not want to put [his] family in this trial stuff." On redirect examination, Anthony acknowledged that he only testified because he was under subpoena. He

did not want to testify because it was "against the gang code," which put him and his family in danger.

¶ 11    Kali testified that, as the Saucedas left Walmart, she noticed defendant's vehicle because it was not in a parking space, but was rather "just sitting there at the end" of the parking aisle. As soon as the Saucedas backed out of their parking space, defendant pulled up and stopped beside the driver's side of their vehicle. Anthony cracked his window and argued with defendant. While Anthony and defendant "were just yelling at each other," a gunshot shattered the Saucedas' driver's side window. Defendant fled. Anthony, the only person shot, drove a couple blocks and stopped in an alley. An undercover police officer arrived and called other officers to the scene. Anthony was taken to the hospital as the police searched the Saucedas' vehicle.

¶ 12    On cross-examination, Kali testified that she did not hear Anthony say anything to defendant before they entered their vehicle, though she focused on her son at the time. Defendant pulled next to the Saucedas' vehicle immediately upon Anthony backing out of the parking space, but Anthony did not "almost strike" defendant's vehicle while reversing. Anthony did not have a firearm at the time of the shooting.

¶ 13    Chicago police detective Chad Behrend testified that he went to the Walmart immediately after the shooting and viewed surveillance footage of the parking lot. Behrend then drove to the alley and searched the Saucedas' vehicle but did not find "any firearms evidence" inside.

¶ 14    The State entered a stipulation that evidence technician Kevin Norris also searched the Saucedas' vehicle but did not find a firearm or any evidence that a firearm had been fired from inside.

¶ 15    Angeles Pena, who was "best friend[s]" with Valentina Juarez, defendant's cousin, testified that she, Juarez, and defendant went to an America's Best located in the same plaza as the Walmart to pick up Pena's contact lenses. Pena went inside while defendant and Juarez waited in defendant's truck. Defendant parked at the end of the aisle instead of in a parking space because they "weren't expecting to stay long." As Pena left the store, Juarez told her to hurry because "they were messing with" defendant. Pena did not know whom Juarez was referring to, but she entered the back seat of defendant's vehicle. She explained that the parking lot had an exit near the America's Best, but that defendant instead drove to a different exit that was "[t]owards the side of Walmart" so that they could "get out through the back."

¶ 16    As defendant drove toward that exit, he pulled parallel to another vehicle that was reversing out of a parking space. Pena was "looking down," but she heard defendant arguing with the other driver, later identified as Anthony. Pena heard Anthony say "Raza and things like that," but she "just kept looking down and ignored it." Pena did not hear Anthony make any threats. While looking down, she saw a light in her peripheral vision and heard glass shatter. Defendant immediately drove away and dropped Juarez off at work. Defendant then drove Pena back to his house, where she stayed for "a couple of minutes after [she] got out of shock."

¶ 17    On cross-examination, Pena reiterated that she did not hear Anthony threaten defendant "in any way," but explained that "it's scary" to hear things about La Raza. Defense counsel  asked Pena whether she felt "threatened" by Anthony, and, over the State's objection, she answered, "Yeah, being in the area which we were in, I was."

¶ 18    On redirect examination, Pena acknowledged that Anthony reversing his vehicle had "nothing to do" with her feeling threatened because he was "just backing out of the space" and not

"trying to hit" defendant's vehicle. She stated that there were alternative ways for defendant to exit the parking lot without going near Anthony's vehicle.

¶ 19    On recross-examination, Pena testified that she "d[id]n't think" that Anthony's vehicle "almost hit" defendant's vehicle. However, she acknowledged testifying before the grand jury that "we almost hit him" as he backed out of the parking space, that defendant drove "up next to" Anthony's vehicle, and that "[n]ext thing you know we're side by side." After further questioning by defense counsel, Pena eventually agreed that "[t]he cars almost collided" because Anthony pulled out of his parking space at the same time defendant drove by. On redirect examination, Pena explained that defendant moved into the left lane "[w]here opposing traffic would come" in order to pull parallel with Anthony's vehicle.

¶ 20    Chicago police sergeant Brian Roney testified that he was at the east end of the Walmart parking lot at approximately 4:15 p.m. on the day of the shooting when he heard "[m]ultiple gunshots." He then saw Anthony's vehicle in the parking lot "traveling at a high rate of speed" toward the exit. Roney followed Anthony's vehicle and activated his lights and siren shortly thereafter. Anthony stopped his vehicle less than one block later and asked for assistance.

¶ 21    Roney did not see any objects leave Anthony's vehicle while he followed it. Roney called for help, and other officers arrived within 30 seconds. Roney returned to the Walmart about 10 minutes later and viewed surveillance footage of the parking lot. He also viewed similar footage captured by a camera at another store that was adjacent to the Walmart. Roney identified videos from both stores in court, and the State entered them into evidence.

¶ 22    On cross-examination, Roney testified that he searched for physical evidence in the parking lot but did not find any. He explained that he searched in the area where he saw Anthony's vehicle but did not look under other vehicles.

¶ 23    One of the video clips identified by Roney, which is in the record on appeal, shows defendant's vehicle at the far end of the parking aisle in which the Saucedas' vehicle is parked. At around 4:13:30 p.m. on the video's timestamp, a man in a black hoodie walks down the adjacent parking aisle. He is followed by a woman holding a child approximately three parking spaces behind him. The man and woman cut through a row of vehicles and approach the Saucedas' vehicle. The man walks off camera at approximately 4:13:51 p.m., and the woman and child leave the frame at the same location at around 4:14:05 p.m. The video is blurry, but it does not appear to show the man approach defendant's vehicle.

¶ 24    At around 4:14:47 p.m., the Saucedas' vehicle begins to back out of a parking space. At that same moment, defendant's vehicle begins to drive down the parking aisle. The Saucedas' vehicle stops reversing at around 4:14:50 p.m., when defendant's vehicle is approximately four parking spaces behind it. Defendant's vehicle then moves into the left lane. As soon as defendant changes lanes, the Saucedas' vehicle drives forward, just off camera. Defendant's vehicle, still in the left lane of the parking aisle, continues forward and momentarily stops. Defendant then drives briefly off camera and reappears onscreen, heading toward the exit at a high speed.

¶ 25    The State entered a stipulation that Anthony suffered a gunshot wound to the left shoulder, which caused a collapsed lung and an omental hematoma. The bullet remained in his body, near his stomach and spleen. He was released from the hospital five days after the shooting.

¶ 26   Cook County sheriff's sergeant Steve Klimek testified that he searched defendant's cell in the Cook County Department of Corrections on the morning of February 21, 2016. Defense counsel objected because "[n]one of this testimony is relevant." Counsel explained that the State was attempting to show that defendant was affiliated with a street gang but had not offered any evidence that defendant's actions were motivated by his involvement in a gang. In response, the State explained that it was seeking to introduce the substance of defendant's prior statements solely "for rebuttal" of the defense witnesses' expected testimony. Defense counsel replied that he had "no issue" with Klimek being called before the defense witnesses, but maintained that there was "nothing on the record thus far" to suggest that the shooting was gang-related. The court overruled defense counsel's objection, but stated that it would not consider the admission of any gang evidence until after it heard the defense witnesses testify. When direct examination resumed, Klimek stated that he recovered several letters from defendant's cell and identified them in court.

¶ 27   The State rested, and the defense moved for a directed finding, arguing that the State had not proven defendant's intent to kill Anthony. The court denied the motion.

¶ 28   Defendant testified that he drove Juarez and Pena to the America's Best at around 4:15 p.m. on May 11, 2015. He and Juarez waited in the vehicle while Pena went inside the store. A man, later identified as Anthony, approached his vehicle. Anthony said "LaRaza, big old Raza," which defendant understood as a gang reference. Defendant ignored Anthony, and Anthony walked away. Pena then exited the store, and defendant told her to "hurry up because they were messing with us." Pena re-entered the vehicle and defendant drove toward the exit. As he turned down an aisle in the parking lot, Anthony's vehicle reversed and nearly struck his front bumper. Defendant "moved to the side" to go around Anthony, and Anthony "started talking more

gangbanging stuff," such as "naming a bunch of gangs [and] saying 'killer' at the end of it." Defendant did not respond. Anthony then reached down and grabbed a "black object." Defendant was "not sure" what the object was, but testified that it "looked like a gun." Defendant drew his own firearm from his right pocket and "let off one shot out of fear for [his] life." He then quickly drove away and dropped Juarez off at work before taking Pena back to his apartment. Sometime thereafter, defendant surrendered to the police.

¶ 29     On cross-examination, defendant testified that Anthony, who was wearing a black hoodie, walked toward defendant's vehicle "from the direction of Walmart," which was on the opposite side of the parking lot from America's Best. Anthony stopped 10 to 20 feet from defendant's vehicle, and then walked away between the other vehicles in the aisle.

¶ 30     Defendant explained that he did not use the exit of the parking lot closest to America's Best because it was near a bar frequented by La Raza members and led to a street with heavier traffic. Defendant instead drove toward an exit closer to Walmart, although it required him to drive down the parking aisle where he had seen Anthony walk. However, defendant did not know that Anthony was driving the vehicle that almost reversed into him until he pulled parallel with it. Defendant testified that he planned to pass Anthony's vehicle, but stopped alongside it because Anthony was "talking a lot of crap," and defendant "was trying to see what he was talking about." Defendant acknowledged that the surveillance footage showed that he tried to pass Anthony's vehicle only after Anthony began to drive forward.

¶ 31     Defendant also agreed that he fired at Anthony "two or three seconds" after pulling parallel to him. He explained that he fired at Anthony's vehicle through his own passenger's side window, which was rolled down. Anthony's driver's side window was cracked "two to three inches."

Defendant denied that La Raza was a gang "in opposition" to him, stating that he does not "gangbang."

¶ 32     Later on cross-examination, defendant identified copies of two letters that he wrote while incarcerated. One of the letters was addressed to his older brother, who went by the nickname "Suicide," and the other was addressed to his friend, Vanessa. Over the defense's objection that the letters were "not impeaching," the court allowed the State to ask defendant whether he made certain statements in them. In particular, defendant acknowledged that he wrote to his brother:

> "But sorry, bro, you know I['m] a[n] hombre before anything, but it's either get with a mob or be lost in this bitch. I am on deck with one of the guys, Lil Wicked."

Defendant explained that Lil Wicked was one of his brother's friends. Defendant also acknowledged writing his brother that:

> "Don't write back to me telling [me] not to be with the mob though, bro, because from what the States know I ain't nada. *** I am going to try to get into IBM, but from what I heard there is a lot of Folks over there. The Donuts especially be there, the ones on BS with the guys, so I am going to finish m[y] three months on this deck and see where are the guys at so I could move around and get to them where I am safe because Lil Wicked gonna be gone in one to two months, so it won't be safe for long. There's an SD, Ambro, IG, Cobra, Dragon, B Conejo from 47th and Damen, the only n***** that is out from around the block. He ain't say nothing yet, but because there is two of us and one of him, my cellie from 24 K-Town."

In the margin next to this statement, defendant wrote, "But my cellie don't bang *** so he ain't rocking with the 47." He explained that "the block" meant the area where he would "chill" with his brother, and that "out" meant a person in opposition to the gangs of the block.

¶ 33    In his letter to Vanessa, defendant wrote that he was "fighting an attempt" with a possible sentence of "31-65 years at 85% SMFH. But, hey, ain't too many n***** out there that ain't gone ride for they block, LOL." He testified that "SMFH" was an acronym for "[s]haking my f***ing head," and that his statement was a reference to a song about people "chilling with their block."

¶ 34    On redirect examination, defendant explained that to be in a "mob" meant to "chill with a certain group of people" in jail. He stated that the people he was "chilling with" in jail "took [him] under their wing" because they knew his brother, a member of the Latin Saints street gang. However, defendant denied that he was in a gang. On recross-examination, defendant acknowledged that the Latin Saints were a rival of La Raza.

¶ 35    Juarez testified that she and defendant were waiting in the car for Pena when they were approached by Anthony, who was wearing a black hoodie. Anthony started screaming the names of different gangs with "killer at the end" and flashing gang signs. Defendant told Juarez to call Pena and tell her that "we had to get out of there." Juarez left the vehicle and approached the store, but Pena came out of the store before Juarez reached the entrance. The women re-entered defendant's vehicle, with Juarez in the passenger's seat, and defendant drove down a parking aisle.

¶ 36    As they drove down the aisle, Anthony's vehicle "backed up really quick" and almost hit them. Defendant stopped and then pulled to the left of Anthony's vehicle. Anthony screamed "vulgar" things like "f*** you, bitch" and reached for something with his hands. Juarez screamed and covered her eyes, so she did not see anything else. However, she heard a single gunshot before

defendant drove away. Juarez did not see defendant or Anthony with a firearm that day. Defendant drove out of the parking lot at the same entrance at which they arrived, which was the one they always used. Defendant dropped Juarez off at work approximately 10 minutes later.

¶ 37    On cross-examination, Juarez testified that she watched Anthony enter his vehicle. She did not call the police after the shooting, and when she eventually spoke to police, she did not tell them that Anthony reached for something in his vehicle.

¶ 38    After the defense rested, the State moved to admit defendant's letters into evidence, arguing that they were impeaching because they showed that he was "knowledgeable of the gang activity [and] the opposition of certain gangs to him." The State also contended that the letters were relevant to show defendant's "consciousness of guilt." In response, defense counsel argued that there was no evidence that defendant was affiliated with a gang, thereby rendering the letters irrelevant. The trial court admitted the letters, stating that there was no evidence that the "organizations" referenced therein were street gangs, but that there was "some value, little as it may be" to evidence that a person "may be unhappy with" someone who belongs to "any organization" that "is opposed to their way of life."

¶ 39    After closing arguments, the court found defendant guilty of aggravated battery with a firearm and aggravated discharge of a firearm towards Anthony, but not guilty of attempting to murder Anthony. The court also found defendant not guilty of aggravated discharge of a firearm toward Kali and Anthony Jr. because "there's no evidence that he was aware of the presence of these two folks." The court merged its findings of guilt into a single count of aggravated battery with a firearm. Defendant filed a motion for a new trial, which the court denied.

¶ 40    The case proceeded to a sentencing hearing, where the court received defendant's presentence investigation (PSI) report and heard arguments from the parties. In aggravation, the State emphasized Anthony's injuries and the fact that the shooting occurred "in broad daylight *** at a crowded shopping district." Consequently, the State requested a sentence of 20 years in prison.

¶ 41    In mitigation, defense counsel noted that defendant was 20 years old at the time of the shooting and was 1 of 11 children raised in poverty by his single mother. He had no criminal history, other than arrests for traffic tickets, and had completed high school. Counsel acknowledged that defendant illegally possessed the firearm he used to shoot Anthony, but contended it was "probably necessary" for him to carry a weapon because he lived in an area with high gang activity.

¶ 42    According to the PSI report, defendant stated that he was expelled from tenth grade after an argument with a police officer. He enrolled in an alternative high school and was in his final year when he was arrested in the present case. He received his diploma while in custody. At the time of his arrest, defendant was being paid by the state of Illinois for "taking care of a disabled person" who was paralyzed from the waist down. He had been so employed for approximately 2½ years and used part of his income to support his mother.

¶ 43    In announcing its decision, the court stated that it "considered the factors in aggravation and mitigation," including the facts that defendant had "no background" and that the shooting "occurred in the middle of the day in a parking lot for a store." The court opined that defendant's actions showed a "disregard [for] the safety of *** his passenger" and that "he's lucky he didn't hit someone else who had nothing to do with this." Accordingly, the court imposed a 16-year sentence, stating that it was "necessary to deter others from committing the same offenses" and

that "any lesser sentence would deprecate the seriousness of this offense." Defendant filed a motion to reconsider the sentence, which the court denied.

¶ 44    On appeal, defendant concedes that he shot Anthony but argues that the State failed to prove that he did not do so in self-defense.

¶ 45    The standard of review for a challenge to the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact remains responsible for weighing the evidence, resolving conflicts in the testimony, and drawing inferences therefrom. *People v. Brown*, 2013 IL 114196, ¶ 48.   The reviewing court must not substitute its own judgment on witness credibility or weight of the evidence for that of the trier of fact, and we may not disturb a conviction unless the evidence was "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 46    In order to prove defendant guilty of aggravated battery with a firearm as charged here, the State was required to establish that he knowingly discharged a firearm and caused injury to another person. 720 ILCS 5/12-3.05(e)(1) (West 2014). As noted, defendant does not deny that he knowingly discharged a firearm and injured Anthony. Rather, his sole argument on sufficiency is that the State failed to prove that he did not shoot Anthony in self-defense.

¶ 47    When a defendant raises a claim of self-defense, the State must prove beyond a reasonable doubt not only the elements of the offense, but also that the defendant did *not* act in self-defense. *People v. Gray*, 2017 IL 120958, ¶ 50. The elements of self-defense are (1) a person was threatened with unlawful force, (2) the person was not the initial aggressor, (3) the threat placed the person in

imminent danger, (4) the use of force was necessary, (5) the threatened person subjectively believed that there was a danger that necessitated the use of force, and (6) that belief was objectively reasonable. *Id.* The State proves that a defendant did not act in self-defense when it negates any one of these elements. *Id.*

¶ 48    Whether a defendant acted in self-defense is a factual question to be decided by the trier of fact. *People v. Young*, 347 Ill. App. 3d 909, 920 (2004). Thus, in a bench trial, it is the role of the trial court to decide the credibility of the witnesses, the weight to be given to their testimony, and which inferences to draw from the evidence. *Gray*, 2017 IL 120958, ¶ 51. A reviewing court must not disturb a trial court's findings on the issue of self-defense unless, after considering the evidence in the light most favorable to the State, it determines that no rational trier of fact could have agreed with the trial court. *Id.*

¶ 49    Here, there was conflicting testimony regarding the initial interaction between Anthony and defendant. Anthony testified that he noticed defendant because defendant "either flicked [him] off" or "threw up a gang sign" at him as he walked to his vehicle. On direct examination, Anthony testified that he did not say anything to defendant, other than possibly "what the F you looking at," and walked away. On cross-examination, Anthony stated that he flashed a gang sign at defendant and "probably" also mentioned La Raza. Kali testified she did not hear Anthony speak to defendant, although she acknowledged that she walked several feet behind him and was tending to her infant son at the time. In contrast, defendant and Juarez, his cousin, testified that Anthony yelled gang-related epithets. Juarez also stated that Anthony used the word "killer" repeatedly.

¶ 50    Defendant claims that, given his knowledge that he was in La Raza territory, it was reasonable for him to interpret Anthony's words as a threat of imminent violence. But it was the

trier of fact's responsibility to resolve the conflicts in the testimony and draw inferences from the evidence. See *id.* We note that defendant testified that Anthony was at least 10 to 20 feet away during their initial encounter, and the video evidence does not show Anthony near defendant's vehicle. There was no testimony that defendant believed Anthony to be armed at this time, and it is undisputed that Anthony walked away after a brief interaction. Thus, based on this evidence, a rational trier of fact could have found that defendant did not reasonably believe he was in imminent danger during his first encounter with Anthony.

¶ 51 And the evidence shows that defendant could have avoided Anthony after the initial interaction but, instead, chose instead to confront him a second time. See *People v. De Oca*, 238 Ill. App. 3d 362, 367-68 (1992) (defendant did not act in self-defense when he shot victim after victim initiated fistfight but then withdrew from it). Defendant's own testimony established that he did not take the shortest route out of the parking lot, but decided on a longer, alternative route that involved driving to where he had just seen Anthony walk. While defendant explained his choice of exit and denied knowing which vehicle was Anthony's, the trier of fact was not required to believe him. *People v. Peterson*, 273 Ill. App. 3d 412, 424 (1995). Juarez, defendant's passenger, testified that she was able to see which vehicle Anthony entered, and the trial court was not obligated to believe that defendant paid no attention to a man who, according to defendant, had just threatened him with imminent violence.

¶ 52 Importantly, the video evidence also supports the notion that, notwithstanding the initial interaction, defendant became the aggressor once Anthony entered his vehicle. The Walmart footage shows that defendant drove toward the Saucedas' vehicle at the exact moment it began to back out of its parking space. The video also belies defendant's contention that Anthony reversed

quickly and nearly struck defendant's vehicle. Instead, the Saucedas' vehicle reversed at a reasonable pace, and defendant stopped well behind it. Defendant then immediately pulled into the oncoming traffic lane and continued forward even though Anthony had begun to drive off. Defendant briefly stopped shortly thereafter, and, although his vehicle was partially off-camera, all of the occurrence witnesses agreed that defendant was directly beside the Saucedas' vehicle.

¶ 53    The trier of fact was not required to believe that defendant stopped immediately beside Anthony only because he "was trying to see what he was talking about," especially since defendant claimed he felt threatened by their initial encounter. Thus, the evidence showed that defendant declined multiple opportunities to avoid Anthony.

¶ 54    While defendant also testified that he felt threatened because Anthony yelled "gangbanging stuff" and "killer" from his vehicle, and the defense witness Juarez corroborated that testimony, none of the State's witnesses, including Pena, who was in defendant's vehicle when the shooting occurred, testified that Anthony said "killer." We also note this interaction lasted only about two seconds. Similarly, it was reasonable for the trier of fact to reject defendant's testimony that he believed Anthony was reaching for a weapon. There was stronger evidence that Anthony was not armed, as Kali and Anthony both denied that Anthony had a firearm, and subsequent searches of the parking lot and the Saucedas' vehicle yielded no evidence of a firearm. Additionally, Roney, who followed the Saucedas' vehicle from the parking lot, did not see any objects being discarded from it. Based on the totality of this evidence, a rational trier of fact could find that defendant was the aggressor in his confrontation with Anthony. Thus, the trial court did not err in rejecting defendant's claim of self-defense.

¶ 55    Defendant next argues that the trial court erred by admitting excerpts from his letters as evidence of his gang affiliation because such evidence was "irrelevant" and highly prejudicial. More specifically, defendant concedes that the letters suggest that he sought the protection of his brother's gang while incarcerated, but he claims that no evidence proved that his ties to a gang motivated him to shoot Anthony.

¶ 56    As an initial matter, defendant acknowledges that he forfeited this issue by failing to include it in his post-trial motion. See *People v. Enoch*, 122 Ill. 2d 176, 187 (1988) (to preserve an issue for appeal, the defendant must both object in the trial court and include the issue in a written posttrial motion). Defendant nevertheless argues that we may review the matter under the first prong of the plain error doctrine because the evidence was closely balanced. The plain error doctrine is a "narrow and limited exception" to the general forfeiture rule that allows a reviewing court to entertain an unpreserved issue if the defendant can show that "a clear or obvious error occurred" and that either (1) the evidence was closely balanced, or (2) the error was so serious as to undermine the fundamental fairness of the trial. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). If the defendant cannot show that a clear error occurred, plain error review is unwarranted. *Id.*

¶ 57    Gang-related evidence is generally admissible if it is relevant to a disputed issue and its probative value is not substantially outweighed by its prejudicial effect. *People v. Joya*, 319 Ill. App. 3d 370, 375 (2001). Evidence is relevant if it has a tendency to make the existence of a fact of consequence any more or less probable. *People v. Gonzalez*, 142 Ill. 2d 481, 487-88 (1991). However, gang evidence is only relevant if gang membership or activity is related to the charged offense, such as when it explains a defendant's motive for "an otherwise inexplicable act." *People v. Smith*, 141 Ill. 2d 40, 58 (1990).

¶ 58    Thus, for example, gang evidence may be relevant to the motive for a shooting when it shows that the defendant and victim were members of rival gangs. See *People v. Colon*, 162 Ill. 2d 23, 30 (1994). While gang evidence may be prejudicial, " '[a]n accused may not insulate the trier of fact from his gang membership where it is relevant to a determination of the case, simply because prejudice attaches to that revelation.' " *Gonzalez*, 142 Ill. 2d at 489 (quoting *People v. Rivera*, 145 Ill. App. 3d 609, 618 (1986)). Instead, the trial court is responsible for weighing the probative value and prejudicial effect of gang evidence, and its ruling will not be overturned absent an abuse of discretion. *Id.* at 489-90.

¶ 59    Here, the court did not abuse its discretion in admitting portions of defendant's letters. As defendant argued that he shot Anthony in self-defense, his motive was the central dispute at trial. See *People v. Figueroa*, 381 Ill. App. 3d 828, 844 (2008) ("in any self-defense case, the defendant's state of mind is a material issue"). Inter-gang hostility was thus relevant.

¶ 60    Even so, defendant argues that the letters were not relevant because (1) there was insufficient evidence that he belonged to a gang, and (2) his actions were not "inexplicable" without gang evidence in light of Anthony's threatening behavior.

¶ 61    With respect to the first argument, we note that, while defendant denied formal membership in a gang, he acknowledges that his brother is a member of a gang rival to La Raza. Defendant also concedes that his letters show that he was associating in jail with gang members friendly to his brother, and that he shot Anthony, a stranger, after Anthony indicated that he was a La Raza member. Additionally, Anthony testified that he first noticed defendant because defendant either "flicked him off" or flashed a gang sign at him. From this evidence, a reasonable trier of fact could

conclude that defendant had some association with a gang hostile to La Raza at the time of the shooting.

¶ 62    Defendant relies on two cases we find distinguishable. In *People v. Weston*, 2011 IL App (1st) 092432, ¶ 3, the defendant was charged with shooting two victims after breaking into their apartment to recover certain firearms that belonged to his cousin. The State sought to explain what it argued was an otherwise "inexplicable act" by introducing evidence that the defendant and his cousin belonged to the same gang. *Id.* ¶¶ 13-14. The trial court admitted the evidence over the defense's objection, but we reversed, finding that (i) there was no evidence that the weapons belonged to the gang and (ii) defendant never mentioned that his actions were gang-related. *Id.* ¶ 31. Rather, the defendant sought to recover the weapons to protect his cousin from the negative consequences of the police finding them first. *Id.*

¶ 63    Similarly, in *Joya*, 319 Ill. App. 3d 370, the defendant, his brother, and two others were charged in a fatal shooting that arose from a bar fight. The State claimed evidence of gang affiliation was relevant to show that the codefendants acted with a common purpose or design. *Id.* at 372. The trial court agreed but we did not, finding "absolutely no testimony that anyone mentioned gang involvement in the shooting either prior to or after the shooting." *Id.* at 377. We also found the gang evidence "cumulative and unnecessary" to prove a common purpose between the defendant and his brother, who fired the fatal shot, as they were family members, and the defendant instructed his brother to retrieve a fire arm moments before the shooting. *Id.*

¶ 64    In contrast, here, the evidence of gang associated helped explain defendant's act of seeking out Anthony after their initial confrontation—what might otherwise be considered an "inexplicable act." See *Smith*, 141 Ill. 2d at 58. And unlike in *Weston* and *Joya*, here there was evidence linking

the crime to defendant's gang affiliation. Notably, in his letter to Vanessa, defendant wrote that he was facing a lengthy prison sentence for attempt murder, "[b]ut hey, ain't too many n***** out there that ain't gone ride for they block, LOL." Despite defendant's self-serving explanation that this was a reference to song lyrics, it was reasonable for the court to interpret it as an admission that he shot Anthony on behalf of his "block," or the neighborhood which he and his brother frequented. Thus, defendant's association with a gang that rivalled La Raza was relevant to the present case.

¶ 65 Defendant also argues that the letters were substantially more prejudicial than probative. But we leave that balancing to the sound discretion of the trial court. *Gonzalez*, 142 Ill. 2d at 489-90. And defendant was tried by the bench, so the danger of unfair prejudice was thus mitigated, as the court is presumed to have known the law and to have considered evidence only for its proper purposes. See *People v. Felton*, 2019 IL App (3d) 150595, ¶ 48 ("The law thus presumes that a judge, unlike a jury, is not likely to find a defendant guilty simply because he or she is a bad person deserving punishment.").

¶ 66 We would finally note that the trial court explicitly stated that it believed the letters provided only "little" value to the State's case. Thus, defendant's argument that he was prejudiced by the admission of his letters is unpersuasive.

¶ 67 In short, defendant's letters were relevant to his motivation for shooting Anthony and were not substantially more prejudicial than probative. Thus, the trial court did not abuse its discretion in admitting them into evidence. As defendant cannot show that the court committed a clear error, his plain error argument fails.

¶ 68    Finally, defendant claims his sentence was excessive due to certain mitigating factors, particularly that he was 20 years old at the time of the shooting, had no criminal history, and was employed. Defendant also contends that "he acted only after repeated threats" and believed that the shooting was necessary to defend himself.

¶ 69    Initially, the State argues that defendant has forfeited this issue on appeal. More specifically, the State argues that defendant did not object to his sentence at the sentencing hearing and that his written motion stating "the Court's sentence is excessive and an abuse of discretion" was not specific enough to preserve the issue of whether the court properly weighed the mitigating factors. We disagree, and instead find defendant's motion sufficient to have apprised the trial court of his objection to the sentence. See *People v. Latto*, 304 Ill. App. 3d 791, 804 (1999) (motion arguing that a sentence was "excessive" was specific enough to preserve the defendant's claim that his sentence was a punishment for exercising his right to trial). We also find that defendant was not required to object in the trial court, as he raised the same relevant points at the sentencing hearing. See *People v. Cosme*, 247 Ill. App. 3d 420, 437 (1993). There is no forfeiture here.

¶ 70    The Illinois Constitution requires that a defendant's sentence be determined "both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Rizzo*, 2016 IL 118599, ¶ 28. A trial court is thus required to consider such factors as the defendant's credibility, demeanor, moral character, social environment, mentality, and age in imposing a sentence. *People v. Alexander*, 239 Ill. 2d. 205, 213 (2010). But because the trial court had a superior opportunity to evaluate these factors, its decision is entitled to "great deference," and we must not substitute our own judgment merely because we might have weighed them differently. *Id.* at 212-13. A sentence will not be disturbed

absent an abuse of the trial court's discretion, which occurs only when the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (1999).

¶ 71    A sentence is presumed proper so long as it falls within the statutory range for the offense. *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 49. Although a trial court must consider mitigating factors, it is not required to explain the weight assigned to each of them. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. The court also need not give more weight to the defendant's potential for rehabilitation than to the seriousness of the offense. *Alexander*, 239 Ill. 2d at 214. Instead, the seriousness of the offense remains the most important sentencing factor. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53.

¶ 72    Here, defendant committed aggravated battery with firearm, a Class X felony punishable by a mandatory prison term of 6 to 30 years. 720 ILCS 5/12-3.05(e)(1), (h) (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014). Thus, defendant's 16-year sentence is presumed proper, as it is well within the statutory range and significantly less than the maximum sentence. Although defendant emphasizes mitigating factors such as his age, lack of criminal history, education, and employment, the record shows that the trial considered all these factors in fashioning a sentence. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 20 (trial court is presumed to have considered information in PSI report). And the trial court also considered the seriousness of the offense, noting that defendant used a firearm that he illegally possessed to commit a shooting at a crowded shopping center in the middle of the afternoon. Thus, we cannot find that the trial court abused its discretion in sentencing defendant to a term 14 years below the statutory maximum.

¶ 73    In sum, the evidence was sufficient to prove beyond a reasonable doubt that defendant did not act in self-defense. The trial court did not err in admitting defendant's letters into evidence or in the sentence it imposed. Defendant's conviction and sentence are affirmed.

¶ 74    Affirmed.